**YALE TRANSPORTATION CORP.,** Empire Carriers Corp., Stone's Express, Inc., and Railway Express Agency, Inc., Plaintiffs,

v.

**UNITED STATES of America,** Interstate Commerce Commission, and United Parcel Service, Inc., Defendants.

United States District Court
S. D. New York.
June 10, 1960.

98

Zelby & Burstein, New York City, by Herbert Burstein, New York City, of counsel, for plaintiffs Yale Transp. Corp., Empire Carriers Corp. and Stone's Express, Inc.

William H. Marx, New York City, for intervenor plaintiff, Railway Express Agency, Inc.

William T. Griffin, New York City, for intervenor plaintiffs Bilkays Express Co., Jersey Coast Freight Line, Inc., Mahon's Express and Parcel Delivery Service, Inc.

Robert A. Bicks, Acting Asst. Atty. Gen., and S. Hazard Gillespie, U. S. Atty., Washington, D. C., Donald L. Hardison, Atty., Dept. of Justice, and H. Neil Garson, Asst. Gen. Counsel, I. C. C., Washington, D. C., of counsel, for defendants United States and Interstate Commerce Commission.

Proskauer, Rose, Goetz & Mendelsohn, New York City, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Bernard G. Segal, Irving R. Segal, Robert L. Kendall, Jr., Philadelphia, Pa., and Jacob Imberman, New York City, of counsel, for intervenor defendant United Parcel Service, Inc.

Before FRIENDLY, Circuit Judge, and MURPHY and PALMIERI, District Judges.

FRIENDLY, Circuit Judge.

Yale Transport Corporation and two other holders of certificates of public convenience and necessity for common carrier service by motor vehicle here seek to enjoin the enforcement of an order of the Interstate Commerce Commission granting an application of United Parcel Service of New York, Inc., hereafter UPS, under § 207 of the Motor Carrier Act, 49 U.S.C.A. § 307, for a certificate to operate as a common carrier. The jurisdiction of the Court is invoked under 28 U.S.C. §§ 1336 and 1398; a court

of three judges has been constituted as provided in 28 U.S.C. §§ 2325 and 2284. Railway Express Agency, Inc. and four other holders of common carrier motor vehicle certificates have intervened in support of plaintiffs; they and the three plaintiffs will be referred to as protestants. UPS has intervened as an additional defendant.

UPS is one of a number of operating companies controlled by United Parcel Service of America, Inc., a Delaware corporation, hereafter UPSA. UPS has long held permits authorizing it to engage as a contract carrier with retail specialty shops or department stores in transporting various commodities between such shops and their warehouses and customers (a) between New York City and adjacent areas in New York, Connecticut and New Jersey, and (b) between West Hartford, Connecticut, and three points in New York and one in New Jersey. In addition UPS has been operating since 1953 as a common carrier rendering what is termed wholesale service in intrastate commerce within New Jersey and in the New York City commercial zone as defined by the New York Public Service Commission and in interstate commerce within that portion of the New York City commercial zone as defined by the Interstate Commerce Commission which was covered by the partial exemption from regulation conferred by § 203 (b) (8), 49 U.S.C.A. § 303(b) (8). An affiliate, United Parcel Service, Inc., a Massachusetts corporation, has been engaged since 1956 in contract carrier service for stores in the Worcester, Mass. area and in wholesale common carrier intrastate service within Massachusetts.

UPS' application here was for authority to engage in the common carriage of general commodities (1) between points within the metropolitan area of New York City and certain adjoining portions of New Jersey, New York and Connecticut; (2) from points in the above area, described as the New York origin area, to points in 13 counties in northern New Jersey, points in Connecticut, Massachusetts, Rhode Island, and a specified territory in eastern New York and returned shipments of the same commodities previously delivered; and (3) from points within and adjoining the metropolitan area of Boston, Mass., described as the Boston origin area, to points in Connecticut, Rhode Island, Massachusetts, northern New Jersey, a described territory in eastern New York, and Southern portions of Vermont, New Hampshire and Maine, and returned shipments of the same commodities previously delivered. The authority was sought subject to certain restrictions which, so far as here material, are as follows:

(a) No service was to be rendered in the transportation of any package or article weighing more than 50 pounds or exceeding 108 inches in length and girth combined, with each package or article considered a separate shipment;

(b) No service was to be rendered between department stores, specialty shops and retail stores and their branches or warehouses or between any of them and the premises of customers; and

(c) No service was to be provided in the transportation of packages weighing more than 100 pounds from one consignor at one location to one consignee at one location on any one day.

The application was heard by an examiner. UPS introduced extensive evidence as to the nature of the operation proposed. The service was designed to handle large volumes of small packages in a faster, more efficient and more economical manner than United States parcel post service, at roughly comparable rates; its general character was similar to that out of the Chicago area as to which this Court sustained the grant of a certificate in Railway Express Agency v. United States, D.C.S.D.N.Y., 153 F. Supp. 738, affirmed per curiam, 1957, 355 U.S. 270, 78 S.Ct. 330, 2 L.Ed.2d 257. Special features included daily automatic pickups, in consideration of a weekly service charge proposed to be $4 in the New York origin area and $2 in the Boston origin area; next-day delivery service throughout most of the destina-

tion territory; deliveries at consignee's premises wherever located and without regard to distance from main highways; a second and, if necessary, a third attempt at delivery if this could not be earlier completed; every reasonable effort to secure the correct address, and notification of this to the consignor, when a package had been misaddressed; return without additional charge of packages which were refused by the consignee or for any other reason could not be delivered; specially designed records to permit prompt answering of inquiries; automatic protection against loss or damage up to $100 per package; receipt of checks as well as cash for C.O.D. shipments; deliveries by uniformed drivers and with vehicles maintained at a high standard of appearance; facilities to permit the handling of fragile merchandise with a minimum of packaging; and collection and return of any package previously delivered, at a charge equal to that for original delivery. All charges were to be billed to and paid by the shippers and hence all shipments would move prepaid.

A large number of shippers from both areas testified as to the advantages of the service proposed by UPS and as to their desire to use it. Protestants and other motor carriers offered evidence as to the availability of service within the area and asserted that UPS' proposed service, although perhaps designed to compete primarily with parcel post, would divert considerable amounts of small package traffic now moved by them and thereby jeopardize the financial soundness of their service.

The examiner recommended that the application be granted as regards the Boston origin area but be denied as regards the New York origin area. He rested the latter recommendation primarily on the ground that superimposing common carrier authority upon UPS' existing contract authority in the New York area would result in "dual operations" inconsistent with § 210 of the Motor Carrier Act, 49 U.S.C.A. § 310. He distinguished the grant of authority in

the Chicago area sustained in Railway Express Agency v. United States, supra, on the basis that the applicant there had consented to a condition cancelling the portion of its contract permit that authorized service between points to be included in the common carrier certificate.

Exceptions having been taken by both applicant and the intervening motor carriers, Division 1 of the Commission sustained the Examiner's affirmative recommendation as to the Boston area and reversed his negative recommendation as to the New York area, 79 M.C.C. 629 (1959). It found that UPS would furnish a distinctive and useful service not now being furnished either by parcel post or by any of the intervening motor carriers, reviewed the evidence with respect to diversion, and concluded, p. 654, that the proposed service was "responsive to a public need which cannot be met adequately by existing transportation facilities and that it can be performed without adversely affecting the operations of existing carriers contrary to the public interest." The Division also found that the dual operations would not be inconsistent with the public interest provided this was safeguarded by two additional conditions. One of these prohibited deliveries to as well as from the premises of persons who had entered into contracts with the applicant and were served by it pursuant to permits issued by the Commission. The other reserved to the Commission the right to impose in the future such terms, conditions or limitations on the certificate as it might find necessary to insure that applicant's operations conformed to the provisions of § 210. One Commissioner dissented with respect to the New York area on the ground that applicant had failed to meet its burden of proving that "existing carriers specializing in handling small packages are not willing and able to meet the needs shown for service to and from the New York City area", p. 657.

The protestants thereupon applied for reconsideration by the Commission, 49 U.S.C.A. § 17(6). In consequence the

effectiveness of the order of Division 1 ·was stayed, 49 U.S.C.A. § 17(8). By order dated February 4, 1960, the petitions for reconsideration were denied. This action followed. Judge Palmieri denied a temporary restraining order and the case is before us on a stipulation that we shall consider the hearing as for both temporary and final relief.

Protestants attack the Commission's order on four principal grounds. First, they assert that the Commission did not have adequate evidence to support its findings of public convenience and necessity of the proposed service and of fitness and ability of the applicant to render it. Second, they contend that the Commission ought not have granted the application in view of the prohibition against dual operations in § 210. Third, they urge that the grant of the application is contrary to commands of § 5 of the Interstate Commerce Act, 49 U.S.C.A. § 5, relating to acquisitions of control. Finally, they argue that the Commission violated the requirements of § 221(b) of the Act, 49 U.S.C.A. § 321(b), in permitting the certificate to become effective when issued on March 9, 1960, although the order of February 4, 1960 denying reconsideration was not served until February 24 or 25. After careful review we find none of these contentions sufficient to warrant enjoining the Commission's order.

### I—Convenience and Necessity and Fitness and Ability.

Defendants contend that the issue of convenience and necessity is largely foreclosed by Railway Express Agency v. United States, supra; protestants assert the circumstances here are significantly different. Of course, no two cases of this sort are exactly alike and the present record does appear to contain a more impressive showing of the service being offered by presently certificated carriers than did that in the Chicago case. Nevertheless, any differences in the evidence as to the value of UPS' service, the availability of other service, and diversion, are not sufficient to take the case out of the area committed to the Commission's judgment. We turn, therefore, to issues of other sorts.

Protestants claim that UPS was merely proposing to render at a lower rate the same service that protestants were rendering or, at least, were able and ready to render. They cite statements of the Commission that an offer of a motor carrier applicant to perform similar services at rates lower than those existing does not warrant the issuance of a certificate, see, e. g., Interstate Dress Carriers, Inc., 77 M.C.C. 787, 791 (1958), these statements being sometimes supplemented with the further remark that "If the rates of protestants are considered by the shippers to be unreasonable, relief is available under other provisions of the Interstate Commerce Act", Superior Trucking Co., 77 M.C.C. 51, 58 (1958). See also E. L. Reddish Contract Carrier Application, 13 Fed.Carrier Cases P 34657 (ICC 1959).[1] They distinguish Schaffer Transportation Co. v. United States, 1957, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117, which reversed a denial of a certificate grounded by the Commission on this view, 63 M.C.C. 247 (1955), as dealing with the offer of lower rates by one form of transportation as against another form, the lower rates offered by the motor carrier in that case representing "inherent advantages" of motor as against rail transportation which the National Transportation Policy, 49 U.S.C.A. note preceding § 1, required the Commission to regard. It is unnecessary for us to determine whether a finding of public convenience and necessity premised solely upon the ability of an applicant, due to alleged superior resourcefulness and efficiency, to offer rates lower than other carriers of the same *genus*, would be adequately supported. For our review con-

1. In Schirmer Transportation Co., 77 M.C.C. 240, 242 (1958), however, the Commission intimated it might consider an applicant's proffer of lower rates a ground for issuing a certificate if the rates of existing carriers constituted an "embargo" on the movement of the commodity in question.

vinces us that protestants' assertion misconceives the evidence and the conclusions that the Commission drew from it.

The evidence of the shipper witnesses, painstakingly reviewed in the report of Division 1, shows that UPS was offering not simply a cheaper but a better mousetrap. It was better than parcel post because of the pickup, assured delivery times, repeated attempts to effect delivery and other features mentioned above. It was better than any service offered by existing motor carriers because although some of these carriers may have duplicated some particular feature of applicant's proposed service, none offered one so flexible and complete. The real thrust of protestants' rate argument thus does not lie in the extreme form just stated but rather in their contention that the shippers indicated they would not utilize applicant's service if its rates were higher than parcel post and applicant produced no adequate evidence of its ability to operate at the rates proposed. There would be force in such an argument if it were factually sustained. However, our review of the evidence indicates that neither branch of the argument is supported, at least in the measure that it would have to be to warrant setting aside the Commission's order.

Protestants did elicit, in their cross-examination of a considerable number of shipper witnesses, testimony, in varying degrees of emphasis, that the cost of any service was a consideration and that, however attractive applicant's proposed service was, the attraction would disappear if there were a substantial rate differential as against parcel post. However, it was hardly to be expected that prospective users of applicant's service would publicly announce their firm intention to use it whatever rate applicant might choose to charge. A number of the shipper witnesses were not cross-examined on the point at all, and a few indicated they would use applicant's service even if the rates were considerably higher than parcel post.[2] Neither is it true that UPS submitted no evidence as to its ability to maintain the proposed rates. Applicant presented an exhibit showing that on its relatively small intrastate wholesale operation in New York, the rates of which were similar to those proposed, it had earned, in 1956, a profit of $76,066 on operating revenues of $2,016,680, with an operating ratio of 96.17% in this service as against its overall operating ratio of 97.57% on its total business of nearly $26,000,000.[3] High as such ratios may seem to those used to dealing with other public utilities, the rapid capital turnover characteristic of motor carriage resulted in applicant's overall operating ratio of 97.57% in 1956 yielding a return of some 19% before income tax on its equity and advances from an affiliate. Applicant's witness also testified that "both the retail contract operation and the wholesale common carrier operation have been profitable" for each of the UPSA affiliates save only "a small pilot operation of this wholesale common carrier type" in Minnesota, a wholesale common carrier operation in Michigan, and the new operation in Massachusetts. It is perhaps surprising that applicant did not produce more substantial evidence upon this point, although some of the wholesale operations may have been too recent, when the witness was testifying over three years ago, to have yielded much useful data. Meagre as this evidence was, we cannot say that when it was combined with the more general testimony "that applicant and its affiliates are thoroughly experienced in the transportation of small packages and have developed efficient and economical methods for the handling of such traffic", 79 M.C.C. at 656, and a common-sense inference that so experienced an operator would not deliberately embark reputation and capital on a venture it did not reasonably think

---

2. One witness testified "It is worth that to us, even if it was doubled." Others said that service was the prime consideration and rates were only secondary.

3. For the same year the industry-wide figures were 96.3% for intercity carriers and 96.7% for local carriers. Ann.Rep. I.C.C.1957, p. 161.

it could perform, there was not adequate basis for the Commission's finding that applicant "has made a favorable showing in this respect", both as this bears on convenience and necessity and on fitness and ability.

## II—Dual Operation.

Section 210 of the Act, 49 U.S.C.A. § 310, prohibits any person from holding both a permit as a contract carrier and a certificate as a common carrier for the transportation of property by motor vehicle over the same route or within the same territory "unless, for good cause shown, the Commission shall find, or shall have found, that both a certificate and a permit may be so held consistently with the public interest and with the national transportation policy declared in the Interstate Commerce Act * * *."

In Gallot-Purchase-Holst, 45 M.C.C. 1, 4 (1946) the Commission stated that this "prohibition is in recognition of the opportunity for discriminatory practices which is present when a carrier is authorized to offer both kinds of service to shippers." It went on to particularize certain types of such discrimination— ability of the shipper to obtain special treatment on his contract carrier traffic by assuring the dual carrier of certain traffic for transportation in common carrier service; ability of the dual carrier to obtain an undue advantage over competing common carriers by giving the shipper special treatment in contract operations; and ability of the dual carrier to accomplish what amounts to a rebate of part of its common carrier charges by agreeing to contract charges lower than it would otherwise accept.

The Commission has been diligent in enforcing this prohibition. See the cases cited in Hale & Hale, Competition or Control, III: Motor Carriers, 108 U.Pa.L. Rev. 775, 826, fn. 226 (1960). However, as the clear terms of the statute show, the prohibition is not absolute.[4] The Commission here found that opportunities for discrimination were sufficiently foreclosed by insulating UPS' contract from its common carriage, not only by prohibiting common carriage from shippers utilizing contract carriage as consignors, as UPS had proposed, but also by prohibiting common carriage to such persons as consignees. UPS cites, in support of the Commission's action, Complete Auto Transit, Inc.-Extension-Willow Run, 71 M.C.C. 383, 387 (1957) and Pacific Motor Trucking Co.-Extension-Oregon, 71 M.C.C. 561 (1957). Protestants seek to distinguish these cases; the distinction asserted in regard to the Complete case is more persuasive than that as to Pacific. Quite apart from Commission precedents, we are unable to see why the safeguards here imposed do not adequately protect against discrimination and consequently how we could say there was no sufficient basis for the Commission's finding that the proposed dual operations would be consistent "with the public interest and the national transportation policy declared in the Interstate Commerce Act."[5]

## III—Alleged Violations of Section 5.

Protestants assert that the grant of a common carrier certificate to UPS would work a change in the character of UPS

4. Senator Wheeler, who was in charge of the bill, stated, 79 Cong.Rec. 5654 (1935), "There are instances in which both types of operation can advantageously be conducted by the same operator and without prejudice to the public interest, but the possibility of uses developing makes it advisable to give the Commission the power to pass on all cases in which it is proposed to combine the two types of operation."

5. Protestants refer to the possibilities of unfair rate differentials resulting from the difficulty applicant would have in keeping records that would accurately reflect the costs of the two types of operation. However, this problem is inherent in any form of transportation where many different types of traffic are handled in the same vehicle or train of vehicles. Applicant maintains a formula for allocating costs to its various services, and the Commission's reservation of jurisdiction is adequate to enable the Commission to order special cost studies whenever these may be indicated.

such as to require a § 5(2) application by UPSA for approval of control of UPS in the latter's altered state, under the doctrine of Pan American Airways Corp. v. C. A. B., 2 Cir., 1941, 121 F.2d 810, 814–816; that there are two other unlawful control relationships in the UPSA family, of which more hereafter; and that the Commission could not lawfully issue a certificate to UPS under these circumstances.

The substance of these allegations was contained in a complaint filed after Division 1 had entered its order granting the UPS certificate and while petitions for reconsideration of that order before the full Commission were pending. At the same time a motion was made to stay all proceedings on the certificate application. On February 4, 1960, Division 1 denied the stay and, on March 2, 1960, Division 4 dismissed the complaint. A petition for reconsideration by the Commission of this order of dismissal is still pending. The Commission argues that, protestants having chosen to proceed in this manner, they are foreclosed from raising the same issues here. We shall not pass on this argument, for we think protestants' contentions fail on the merits.

Protestants' position runs counter to another portion of the Pan American opinion, where the Court of Appeals held, at page 816, that the absence of an order approving the parent steamship company's control of the newly organized airline subsidiary, which the court found to be required, did not bar the issuance of a certificate to the subsidiary. This ruling would seem fully applicable to the Motor Carrier Act on which, as is well known,[6] the Civil Aeronautics Act was modeled. Protestants assert that this holding in the Pan American case has been undermined by subsequent cases, notably United States v. Marshall Transport Co., 1944, 322 U.S. 31, 64 S.Ct. 899, 88 L.Ed. 1110. This could hardly be so as a matter of decision since Marshall was itself an acquisition of control and

not a certificate case; and we can find no language in the Supreme Court's opinion that even deals with, much less reflects on, this portion of the Pan American decision. Indeed, the only recent pronouncement of the Supreme Court that we deem to have any bearing on the problem seems rather to support the holding in Pan American. In American Trucking Associations v. United States, 1957, 355 U.S. 141, 78 S.Ct. 165, 2 L.Ed.2d 158, the Court drew a distinction between the considerations governing the issuance of a certificate to a railroad-controlled truck line under § 207 of the Motor Carrier Act, 49 U.S.C.A. § 307, and those governing applications for approval of railroad control of a truck line under § 5(2) (b). The Court said 355 U.S. at page 149, 78 S.Ct. at page 170, that "the legislative history of the Motor Carrier Act of 1935 gives no indication that § 213(a) (1), the predecessor of § 5(2) (b), was to be considered a limitation on applications under § 207" and approved the Commission's practice of accepting "the policy of § 5 (2) (b) as a guiding line, not as a rigid limitation" in interpreting § 207.

■ Of course, the Commission would hardly issue a certificate under § 207 when there had been a deliberate and serious flouting of the requirements of § 5(4) with respect to the very transportation concerned, and we need not decide whether the rule of the Pan American case would go so far as to permit this. On the other hand, when the violation of § 5(4) has been due to excusable oversight or neglect, the Commission may well find that the public ought not be denied the advantages of the proposed service during any proceedings necessary for the rectification or removal of the illegal control; certainly the Commission should be able to do this when the alleged illegality concerns an area or a type of transportation unrelated to that for which a certificate is being sought. The seeming simplicity of § 5(2) veils complexities that have baffled not only the industry

6. See the concurring opinion of member Ryan on remand in American Export Airlines, Inc., 3 C.A.B. 619, 627 (1942), and the supplemental opinion of the full Board on reargument, 4 C.A.B. 104, 107 (1943).

and the Commission but the Courts. See Alleghany Corp. v. Breswick & Co., 1957, 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726; Id., 1958, 355 U.S. 415, 78 S.Ct. 421, 2 L. Ed.2d 374. It would be absurd to hold that innocent failure to anticipate the course of administrative or judicial interpretation of the section necessarily worked a temporary outlawry, at the cost not only of the offender but of the public.

■■ Of the three claims of illegal control made by protestants, the only one relating to the area in which applicant's operations were to be conducted was the claim that the new common carrier authority proposed to be conferred on UPS demanded a proceeding under § 5(2) for approval of additional control of UPS by UPSA.[7] No such approval was needed. Protestants' reliance on Pan American Airways Co. v. C. A. B., supra, and the decisions of the Commission applying that holding in motor carrier cases, is misplaced. The Pan American case dealt with acquisition of a subsidiary which had never been a carrier until it became one by the grant of a certificate; the Court of Appeals held there was no tenable basis for distinguishing between a case where a steamship company acquired all the stock of a company that was already a carrier, in which instance approval would clearly be required, and a case where a steamship company first acquired the stock of a company not engaged in any business and then made it a carrier. This is the principle that the Commission adopted in M. J. Hannon-Control-Hannon Motor Lines, Inc., 39 M. C.C. 620 (1944), in which the controlling company became a carrier, and followed in Schwerman Trucking Co.-Control-Schwerman Trucking Co. of Texas, 80 M. C.C. 382 (1959), overruling Smith-Control-Cement Transports, Inc., 75 M.C.C. 495 (1958). This principle applies only when a controlled or controlling person not theretofore a carrier first becomes one; it cannot logically be extended to

require a new proceeding under § 5(2) whenever a carrier controlled by a person who has obtained approval or who was not required to obtain this because of grandfather status, expands its operations. Protestants do not seriously contend that new approval is needed when the expansion is by adding areas or commodities; we see no basis for a different rule when the expansion comes by adding contract or common carrier authority to a carrier that previously held only the other. This conclusion follows as a matter not only of good sense but of language and practice as well. Section 5(2) relates to acquisition of control of a "carrier", § 5(13) defines carrier so far as here relevant as "a motor carrier subject to Part II of this Title", and § 203(a) (16) says that "The term 'motor carrier' includes both a common carrier by motor vehicle and a contract carrier by motor vehicle." In numerous cases the Commission has approved dual operation by a motor carrier controlled by a person who would be required by § 5(2) to obtain approval of a new acquisition of control of a motor carrier, see Scott Bros., Inc.-Extension, 34 M.C.C. 163 (1942); Complete Auto Transit, Inc.-Extension-Willow Run, 71 M.C.C. 383 (1957); Pacific Motor Truck Co.-Extension-Oregon, 71 M.C.C. 561 (1957); cf. Rogers Cartage Co.-Extension, 27 M.C.C. 276 (1941). In none has the Commission indicated that action under § 5(2) would be required.

■ The other two allegedly unlawful control situations concern operations unrelated to the areas here involved. Protestants claim that the Commission granted a 1938 application for a contract carrier permit for United Parcel Service of Pennsylvania, Inc., 10 M.C.C. 83 (1938), which thereby became a carrier for the first time, without the parent UPSA having applied for approval of control as was later held to be required when the Commission in the M. J. Hannon case, supra, adopted the rule of the Pan American case. If the Commission

---

7. No prior approval of the UPS–UPSA relationship had been had or required since this antedated enactment of the

Motor Carrier Act. Greyhound Mergers, 1 M.C.C. 342, 352 (1935).

is concerned about this omission understandably made a score of years ago, § 5 (7) affords a remedy; but this did not forbid the issuance of a certificate here, even if we assume that protestants have standing to raise the question. The other alleged illegality is that in proceedings wherein the Commission allowed United Parcel Service of Portland, Oregon, to purchase the operating rights of A. J. Wiese, 37 M.C.C. 473 (1941), and approved the acquisition of control of the Portland company by United Parcel Service of America, Inc., a Nevada corporation, UPSA, which owned all the stock of the Nevada corporation, did not join as an applicant, as United States v. Marshall Transport Co., supra, later held it should. However, the Supreme Court has said in Alleghany Corp. v. Breswick & Co., 1957, 353 U.S. 151, 171, 77 S.Ct. 763, that although the Commission may require the ultimate parent to be joined as an applicant, such joinder is not jurisdictional and lack of it does not make the Commission's grant of approval unlawful. Even if the case were otherwise, the same considerations stated in connection with the Pennsylvania company would deprive the argument of effect here.

IV—Alleged Violation of § 221(b).

Section 221(b) of the Motor Carrier Act, 49 U.S.C.A. § 321(b), says that "Except as otherwise provided in this chapter, all orders of the Commission shall take effect within such reasonable time, not less than thirty days, as the Commission may prescribe * * *." Section 16(5) directs that "Every order of the commission shall be forthwith served upon the designated agent of the carrier in the city of Washington or in such other manner as may be provided by law." The Commission's order denying reconsideration of the order of Division 1 granting the certificate, although dated February 4, 1960, was not served until February 24 or 25. The certificate was issued on March 9, effective immediately. Protestants urge that the certificate could not validly be made effective less than thirty days from the date of its issuance or, in the alternative, that it could not be issued in less than thirty days from what they claim to be the earliest possible effective date of the February 4 order, to wit, thirty days from the date of service, or March 25.

■ Protestants' first position requires little discussion. In United States v. Seatrain Lines, Inc., 1947, 329 U.S. 424, 432, 67 S.Ct. 435, 439, 91 L.Ed. 396, the Supreme Court held that the authorization in § 315(c) of the Interstate Commerce Act, 49 U.S.C.A. § 915, to the Commission to "suspend, modify, or set aside its orders" with respect to water carriers "upon such notice and in such manner as it shall deem proper" did not authorize the Commission so to modify a certificate, the Court saying "That the word 'order', as here used, was intended to describe something different from the word 'certificate' used in other places, is clearly shown by the way both these words are used in the Act." On a parity of reasoning, assuming that the direction in § 221(b) that an order shall not become effective in less than thirty days applies to an order granting a certificate, this means only that the certificate cannot become effective until the order has become effective, not that the certificate is itself an "order" and must contain still another thirty-day waiting period.

■ Protestants' alternative position is likewise unsound. We shall assume in protestants' favor, without deciding, that § 221(b) applies to orders granting certificates, as literally it surely does, despite the contrary view with respect to the corresponding provision, § 15(2), in Part I of the Interstate Commerce Act intimated in Breswick & Co. v. United States, D.C.S.D.N.Y.1956, 138 F.Supp. 123, 128, reversed on other grounds, Alleghany Corp. v. Breswick & Co., 1957, 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726. It would follow that the thirty-day requirement of § 221(b) applied to the June 3, 1959 order of Division 1 granting the certificate which, under § 17(4), had "the same force and effect * * * as if made or taken by the Commission." As a result of the applications for reconsideration by the full Commission and the

stay granted by § 17(8), any time requirements with respect to effectiveness of that order have been amply fulfilled. Protestants say, however, that the order of February 4, 1960 denying reconsideration was itself subject to § 221(b) and could not become effective until thirty days after service. Assuming in protestants' favor, again without deciding, that the service requirement of § 16(5) is to be read into § 221(b), we think it would be undue literalism to construe § 221(b) as directing that an order which merely declares the Commission's unwillingness to review the action of one of its divisions, otherwise legally effective, and thereby terminates the stay of § 17 (8), cannot become effective for thirty days. To be sure, permitting the order of a division to become effective immediately on the denial of reconsideration by the full Commission may create problems with respect to judicial review, as was vividly illustrated in Breswick & Co. v. United States, D.C.S.D.N.Y.1955, 134 F.Supp. 132, 136. However, to construe § 221(b) as compelling a delay of another thirty days in every case would present even worse problems. We believe Congress did not mean to impose any such shackles but rather to leave the matter to the Commission's good judgment.[8]

Even if we were to take a different view, it would not avail protestants. Section 10(e) of the Administrative Procedure Act, 5 U.S.C.A. § 1009(e), directs that in judicial review of administrative action "due account shall be taken of the rule of prejudicial error." Protestants were not prejudiced by issuance of the certificate on March 9 rather than a fortnight later. They had two weeks between service of the Commission's order denying reconsideration and the issuance of the certificate, in which to initiate this action. In fact the complaint was

filed on March 14, only five days after the certificate was issued. Neither Judge Palmieri in refusing a temporary restraining order nor we in denying an injunction have relied in any way on UPS' beginning to operate under a certificate which UPS knew was subject to challenge.

Accordingly the requests for temporary and final injunctions are denied and the complaint dismissed.

THOMAS F. MURPHY and PALMIERI, District Judges, concur.

---

8. Apparently the Commission's practice in this respect is not uniform. In Seatrain Lines, Inc. v. United States, D.C.Del.1957, 152 F.Supp. 619, 621, affirmed per curiam 1957, 355 U.S. 181, 78 S.Ct. 265, 2 L.Ed. 2d 186, a Commission order denying reconsideration made the Division order effective 32 days thereafter. In Consolidated Freightways, Inc. v. United States, D.C.N.D.Cal.1959, 176 F.Supp. 559, 561, a Commission order denying reconsideration made the Division order effective 53 days thereafter.