**RAILWAY EXPRESS AGENCY, INC.,**
Plaintiff,

v.

**UNITED STATES of America and Interstate Commerce Commission,**
Defendants,
and
**United Parcel Service, Inc., Intervening Defendant.**

United States District Court
S. D. New York.
June 1, 1962.

William Q. Keenan, New Haven, Conn., John H. Engel, New York City, for plaintiff.

John F. X. Peloso, Atty., New York City (Robert M. Morgenthau, U. S. Atty., New York City, Lee Loevinger, Asst. Atty. Gen., Donald L. Hardison, Atty., Washington, D. C., on the brief), for defendant United States.

H. Neil Garson, Associate Gen. Counsel (Robert W. Ginnane, Gen. Counsel, Betty Jo Christian, Atty., Washington, D. C., on the brief), for defendant Interstate Commerce Commission.

Irving R. Segal, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa. (Bernard Segal, Robert L. Kendall, Jr., Philadelphia, Pa., Burton A. Zorn, New York City, of counsel; Proskauer, Rose, Goetz & Mendelsohn, New York City, on the brief), for intervening defendant United Parcel Service, Inc.

Before FRIENDLY, Circuit Judge, and MURPHY and PALMIERI, District Judges.

FRIENDLY, Circuit Judge.

Railway Express Agency, Inc., (REA), brings this action, 28 U.S.C. §§ 1336, 2321–2325, against the United States and the Interstate Commerce Commission to set aside an order of the Commission, No. MC–66562 (Sub-No. 1671), denying its application, and an order of the Commission, No. MC–115495 (Sub-No. 3), granting an application of United Parcel Service, Inc. (UPS), each seeking a certificate of public convenience and necessity to engage in certain motor carrier transportation. A motion for a temporary injunction was heard by us on January 5, 1962, and denied in an oral opinion delivered that day and in an order entered January 10, 1962. We also denied an application for a stay, as did Mr. Justice Harlan, 7 L.Ed.2d 432. Accordingly the certificate to UPS issued.

The action is now before us on motion for final relief. Seeing no reason to depart from the conclusions reached on the motion for a temporary injunction, we now dismiss the complaint.

The UPS application, filed January 4, 1960, sought authority to transport packages (other than of certain excluded types) weighing not more than 50 pounds and not exceeding 108 inches in length and girth combined, between all points and places in a territory comprised of the states of Illinois, Indiana and Ohio, portions of the states of Michigan, Missouri and Wisconsin, and the cities of Davenport, Clinton and Dubuque, Iowa, excluding service between retail stores and the premises of customers. An additional restriction stipulated at the hearing and included in the Commission's order prohibited transportation of packages or articles weighing in the aggregate more than 100 pounds from one consignor at one location to one consignee at one location on any one day. Characteristics of the proposed UPS service were similar to those described in Yale Transportation Corp. v. United States, 185 F.Supp. 96 (S.D.N.Y.1960), aff'd per curiam, 365 U.S. 566, 81 S.Ct. 754, 5 L.Ed.2d 806 (1961).

On February 12, 1960, REA entered a protest to UPS' application. The Commission assigned UPS' application for prehearing conference February 26, 1960. REA attended the conference, at which public hearings were set to commence May 9, 1960.

May 2, 1960, REA filed its application to operate "over irregular routes in the transportation of general commodities moving in express service" between all points in the same territory covered by UPS' application but without the exclusions or restrictions of the latter. The REA application had been preceded by a petition, filed April 29, 1960, requesting consolidation of the two proceedings. On May 25, 1960, the Assistant Director of the Commission's Bureau of Operating Rights advised REA that its petition for consolidation had been received too late for the 20 day period, allowed

for a reply by the I.C.C. Rules of Practice, 49 C.F.R. § 1.23(a), to elapse prior to the May 9 hearing date already set on the UPS application. Hearings on the latter began on May 9 and concluded on August 20 after 32 hearing days and the testimony of a multitude of shipper witnesses as to the public convenience and necessity of the proposed service. REA appeared in these hearings as an intervenor. In addition to offering extensive evidence to negate the public convenience and necessity of the UPS service and to show its diversionary consequences, REA called attention to its own application, which it regarded as preferable if any general package delivery service was to be authorized. A considerable number of shippers supported the adequacy of REA's existing service, and some expressed a preference that any new service be rendered by REA. On November 1, 1960, the Commission formally denied the REA application for consolidation.

Meanwhile, on October 7, 1960, the REA application had come on for hearing before another examiner. REA present-ed a single witness, the assistant to its Vice President, Operations. REA sought to rely on the shipper evidence tendered in the UPS proceeding but made no effort to comply with the Commission's Rule of Practice, 49 C.F.R. § 1.82, that no portion of the record before the Commission in any other proceeding may be offered in evidence unless a true copy was presented for the record in the form of an exhibit or the parties stipulated to incorporation by reference. Whereas only three motor carriers in addition to REA had protested the UPS application, the American Trucking Association and more than 150 motor carriers, plus UPS, protested REA's. However, after listening to the REA witness, the intervenors neither cross-examined nor presented rebutting proof, but moved to dismiss.

On December 1, 1960, the Examiner who had heard the REA application recommended denial on the basis "that applicant has failed to establish that the present or future public convenience and necessity require the proposed opera-tion"; on July 12, 1961, Division 1 of the Commission served an order of denial. Meanwhile, on April 26, 1961, the Examiner who had heard the UPS application recommended its grant; by order served November 8, 1961, Division 1 adopted this recommendation.

■ Although the complaint purports to challenge the denial of REA's application, REA makes no substantial contention on this score save for its assertion that the procedure followed with respect to both applications denied REA rights to which it was entitled under Ashbacker Radio Corp. v. F. C. C., 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). While that case involved applications which were "mutually exclusive" in a physical sense, we take it that the Supreme Court there laid down a general principle that an administrative agency was not to grant one application for a license without some appropriate consideration of another *bona fide* and timely filed application to render the same service. Of course, the principle, correctly said to possess "a large and complex future", 1 Davis, Administrative Law Treatise (1958) 576, is much easier to state, especially in this deliberately loose way, than it is to apply,—as witness particularly the cases where the Civil Aeronautics Board has consolidated all applications within the same territory, yet the grant to one applicant already possessing authority from one border of the territory would enable it to render service for which competing applications were to be heard in another proceeding less far advanced, see Delta Air Lines, Inc. v. C. A. B., 107 U.S.App.D.C. 174, 275 F.2d 632 (1959), cert. denied, 362 U.S. 969, 80 S.Ct. 953, 4 L.Ed.2d 900 (1960). Nevertheless it constitutes a fundamental doctrine of fair play which administrative agencies must sedulously respect and courts must be ever alert to enforce.

Recognition of Ashbacker as a basic requirement of fair play does not mean, however, that administrative agencies are placed in a procedural strait jacket. Indeed, the variety and complexity of the situations that arise demand a consid-

erable degree of administrative skill and flexibility if the desideratum of fairness to applicants is to be achieved without obstructing the public business. The requirement is that comparative consideration of *bona fide* and timely filed applications to render the same service should be had, not that it should be had in some particular manner. Whether this should be given through consolidation, by separate consideration in which each applicant is permitted to urge its proposal in opposition to that of the other, or in still other ways, is normally for the agency to determine. Some years after Ashbacker, the Supreme Court, in Federal Communications Commission v. WJR, The Goodwill Station, Inc., 337 U.S. 265, 283, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949), reiterated its statement in F. C. C. v. Pottsville Broadcasting Co., 309 U.S. 134, 138, 60 S.Ct. 437, 84 L.Ed. 656 (1940), that "the scope of the inquiry, whether applications should be heard contemporaneously or successively, whether parties should be allowed to intervene in one another's proceedings, and similar questions" were left to the agency's "own devising, so long, of course, as it observes the basic requirements designed for the protection of private as well as public interest."

■ Here the Commission opted for consideration in separate hearings. It was abundantly justified in doing so. We shall not dwell on defendants' challenge to the *bona fides* of REA's application, or even on what seems the inexcusable delay in its filing, a delay that would have been enough to eliminate any obligation of comparative consideration if the Commission had a rule of practice such as the C. A. B.'s Rule, 14 C.F.R. § 302.12(b), requiring applications for consolidation to be made not later than the prehearing conference unless good cause for late filing is shown—and perhaps even though it did not. Although REA's application included transportation of the same articles in the same area as UPS', it included considerably more; the Commission could well have thought that the larger scope of REA's application, as well as the issue of REA's railway affiliation, would produce so much more opposition that separate rather than consolidated consideration would be administratively preferable. Its determination to proceed in that manner violated no legal right of REA so long as matters were so managed that UPS' application was not granted before the Commission had REA's before it for consideration.

■■ Decision that REA was not entitled to a consolidated hearing as a matter of law if some other suitable method of comparative consideration was afforded, almost completely disposes of this phase of REA's complaint. REA's application was decided not after but before UPS'. Hence, if REA was not entitled to consolidation as a matter of law, its only remaining grievance on this phase of the case must be that the Commission was not warranted in denying REA's application as a matter of fact. However, REA makes no real challenge to the Commission's denial, apart from its complaint on the score of consolidation. Clearly the finding that REA had failed to prove public convenience and necessity for its service by the evidence at its own hearing was not without basis. Whether or not the Commission might have considered shipper evidence taken at the UPS hearing in deciding the REA application, see United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946), it was not required to do so. REA made no attempt to comply with the Commission's Rule of Practice on this subject, 49 C. F.R. § 1.82; yet compliance with that rule was in no sense a mere technicality in view of the many protestants in the REA case who had not appeared in the UPS case and the need of segregating the portions of the large UPS record which REA regarded as showing the public convenience and necessity of its own application. It may be that the Commission's method of handling the two cases caused some difficulties for REA's presentation of an essentially "defensive" application; but this creates

no legal invalidity, quite apart from the responsibility attributable to REA's failure to seek consolidation until the eve of the hearing.

REA's second ground of attack requires a statement of certain provisions of the Motor Carrier Act and of the Commission's regulations thereunder. Section 208 of the Interstate Commerce Act, 49 U.S.C.A. § 308, provides as follows:

"Any certificate issued under section 206 or 207 shall specify the service to be rendered and the routes over which, the fixed termini, if any, between which, and the intermediate and off-route points, if any, at which, and in case of operations not over specified routes or between fixed termini, the territory within which, the motor carrier is authorized to operate; * * *."

Pursuant to this section and the authorization in § 204(b), 49 U.S.C.A. § 304(b), to establish "just and reasonable classifications of * * * groups of carriers", the Commission has published regulations, 49 C.F.R. § 165.1, defining "Regular-route scheduled service (Class A)", "Regular-route nonscheduled service (Class B)", "Irregular-route radial service (Class C)", and "Irregular-route nonradial service (Class D)". In Transportation Activities of Brady Transfer and Storage Co., 47 M.C.C. 23 (1947), the Commission outlined eight characteristics which it thought would tend to identify regular-route carriers; when an operation was characterized by a substantial number of such practices "and when they are not explained or justified by any special circumstances, they cumulate and compel the conclusion that conversion to a regular-route operation has been accomplished," 47 M.C.C. at 49. However, the Commission went on to say "that it is impossible in this case, or in any other, to lay down a general rule by which the regular- or irregular-route character of all operations can be determined. Too much depends upon the peculiar characteristics of each considered operation and upon the surrounding circumstances. We are convinced that each must be judged on its own particular facts." 47 M.C.C. at 52.

REA complains that although a major portion of UPS' operations possesses, as REA alleges, seven of the eight Brady characteristics (the eighth being schedules or their equivalent), the Commission has issued a certificate for Irregular-route nonradial service (Class D). The defendants dispute that UPS' operations possess all the other Brady characteristics, notably predetermined plan, fixed routes and periodicity of service, either in whole or in substantial part.

We assume that if § 208 required a specification of routes, as § 401(e) of the Federal Aviation Act, 49 U.S.C.A. § 1371(e), requires a specification of points in all air certificates, and the Commission had failed to make such a specification, issuance of the certificate would be unlawful, see United Air Lines, Inc. v. C. A. B., 108 U.S.App.D.C. 1, 278 F.2d 446, judgment vacated, 364 U.S. 297, 81 S.Ct. 267, 5 L.Ed.2d 89 (1960). However, we read § 208 of the Motor Carrier Act as authorizing but not requiring the Commission to limit a freight carrier to "specified routes"; [1] it says, quite specifically, that if operations are "not over specified routes or between fixed termini", it is enough for the Commission to name "the territory within which, the motor carrier is authorized to operate."

Once this point is past, the legal significance of REA's contentions escapes us, even if, arguendo, we were to make the assumption, rather large indeed, that the Commission's determination of the irregularity of UPS' operation was so lacking in factual support as to require us to set it aside despite the Commis-

1. Section 208 must be contrasted with § 207(a), 49 U.S.C.A. § 307(a), providing that under that section no certificate "shall be issued to any common carrier of passengers by motor vehicle for opera-

tions over other than a regular route or routes, and between fixed termini, except as such carriers may be authorized to engage in special or charter operations."

sion's disclaimers of the universality of the Brady criteria which we have quoted. The distinction between regular and irregular route operations, made by the Commission under the authority to classify carriers granted by § 204(b) of the Motor Carrier Act, 49 U.S.C.A. § 304(b), was a necessary incident to its discharge of the duty, imposed upon it by the "grandfather clause", § 206(a), that it grant a certificate, as therein provided, to a carrier which was operating on June 1, 1935, "over the route or routes or within the territory for which application is made and has so operated since that time." See Fulda, Competition in the Regulated Industries: Transportation (1961) 92–96. The Commission decided, and was upheld in deciding, that the certificate granted should conform to the operation relied on as requiring the grant—for "regular route" service if the operation had been over a "route or routes", for "irregular route" service "within the territory" if it had not been, United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 480–482, 62 S.Ct. 722, 86 L.Ed. 971 (1942); Crescent Express Lines, Inc. v. United States, 320 U.S. 401, 64 S.Ct. 167, 88 L.Ed. 127 (1943); see United States v. Maher, 307 U.S. 148, 155, 59 S.Ct. 768, 83 L.Ed. 1162 (1939). If this distinction was to be something more than a dead letter, the terms of the grant had to be policed—a carrier given only the "irregular route" certificate to which its prior operations entitled it, may not operate a "regular route" service without further authorization. See Ex Parte No. MC–55, Motor Common Carriers of Property—Routes and Services, decided December 4, 1961, sheets 33–36. This was the situation in the Brady case, where the Commission's direction that the carrier revert to the irregular service, for which alone it had been certificated, was affirmed by the highest tribunal. Brady Transfer and Storage Co. v. United States, 80 F.Supp. 110 (S.D.Iowa), aff'd, 335 U.S. 875, 69 S.Ct. 239, 93 L.Ed. 418 (1948); see also Falwell v. United States, 69 F.Supp. 71 (W.D.Va.1946), aff'd, 330 U.S. 807, 67 S.Ct. 1087, 91 L.Ed. 1264 (1947); Arrowhead Freight Lines, Limited v. United States, 115 F.Supp. 537 (S.D.Cal. 1953). We assume that, under § 207 also, a carrier will be held to certificate provisions limiting it to the type of service which it proposed and for which it established public convenience and necessity and fitness, willingness and ability.

Here there is no suggestion that UPS is offering, or intends to offer, any service other than what it proposed. No one, least of all REA, could possibly have been misled; three previous proceedings before the Commission, to which REA had been a party, United Parcel Service, Inc., Common Carrier Application, 68 M.C.C. 199 (1956), aff'd sub nom. Railway Express Agency v. United States, 153 F. Supp. 738 (S.D.N.Y.), aff'd per curiam, 355 U.S. 270, 78 S.Ct. 330, 2 L.Ed.2d 257 (1957); United Parcel Service of New York, Inc., Common Carrier Application, 79 M.C.C. 629 (1959), aff'd sub nom. Yale Transportation Corp. v. United States, 185 F.Supp. 96 (S.D.N.Y.1960), aff'd per curiam, 365 U.S. 566, 81 S.Ct. 754, 5 L.Ed.2d 806 (1961); United Parcel Service, Inc., Extension—Arizona and California, MC–115495 (Sub. No. 2), May 17, 1960,—not to speak of numerous intrastate proceedings,—had created wide public knowledge of UPS' proposed method of operation. It would require rather extraordinary naiveté not to have realized that the conduct of UPS' service throughout the middle western territory described in its application would involve frequent operation over the main highways connecting such city pairs as Chicago, Detroit, Cleveland, Cincinnati and St. Louis. The Commission, and the industry, knew what service UPS proposed, and the Commission, in granting the application, must have intended to issue a certificate permitting what UPS had asked and for which, as the Commission found, it had proved public convenience and necessity and fitness, willingness and ability. So far as the statute goes, the Commission could have issued a certificate permitting exactly that and say-

**838**

ing nothing more; if it chose to baptize the document with a title from its catalogue which it thought closest to being apt, no legal rights of REA are violated if the fit be not altogether precise.

The injunction is denied and the complaint dismissed.