UNITED STATES ᴇᴛ ᴀʟ. *v.* SEATRAIN LINES, INC.

No. 61.   Argued December 9, 1946.—Decided January 6, 1947.

*Edward M. Reidy* argued the cause for the United States and the Interstate Commerce Commission, appellants. With him on the briefs were *Solicitor General McGrath, Assistant Solicitor General Washington, Assistant Attorney General Berge, Frederick Bernays Wiener, Edward Dumbauld* and *Daniel W. Knowlton.*

*Wilbur La Roe, Jr.* argued the cause for respondent. With him on the brief were *Parker McCollester* and *Arthur L. Winn, Jr.*

MR. JUSTICE BLACK delivered the opinion of the Court.

Seatrain is and long has been a common carrier of goods by water. Its harbor facilities and vessels have been constructed to enable it to perform a distinctive type of water carriage. Loaded railroad cars can be hoisted and transported in its vessels, thereby eliminating such things as trouble, time and breakage, said to be incident to loading and unloading goods from railroad cars. See *United States* v. *Pennsylvania R. Co.,* 323 U. S. 612. Seatrain

vessels also have tank space for carriage of liquid cargoes in bulk.[1]

Part III of the Interstate Commerce Act, 54 Stat. 929, 49 U. S. C. § 901, *et seq.,* subjected water carriers to the jurisdiction of the Interstate Commerce Commission. Section 309 (a) of that Act required them to obtain certificates of public convenience and necessity from the Commission. The same section contains a proviso commonly referred to as the grandfather clause. It provides that any water carrier, with an exception not here material, which was in bona fide operation as a common carrier by water on January 1, 1940, shall be entitled to a certificate to continue operations over the route or routes which it had been serving previous to that date without determination by the Commission of the question of public convenience and necessity.

May 29, 1941, Seatrain filed two applications with the Commission to obtain certificates for two different routes, one of which it had operated since 1932, and another which it had begun to operate in 1940 shortly after passage of the water carrier provisions. Seatrain's application described its operation on each route as that of a "common carrier by water of commodities generally." After due notice had been given to all interested parties, Division 4 of the Commission conducted investigations, satisfied itself as to the right of Seatrain to be granted both applications under the provisions of the Act, made appropriate findings, and concluded that Seatrain was entitled to engage in transportation on both the routes as "a common carrier by water of commodities generally." A single certificate to carry "commodities generally between the ports of New York, N. Y., New Orleans, La., and Texas City, Tex., by way of the Atlantic Ocean and the Gulf of

---

[1] For a description of Seatrain equipment, see *Investigation of Seatrain Lines, Inc.,* 195 I. C. C. 215, 218–222.

Mexico" was accordingly issued to Seatrain. By its terms it became effective August 10, 1942, subject "to such terms, conditions, and limitations as are now, or may hereafter be, attached to the exercise of such authority by this Commission."

A year and a half later, January 27, 1944, the Commission, on its own motion, ordered that the proceedings be reopened for the purpose of determining whether the 1942 certificate should not be modified so as to deprive Seatrain of the right to carry commodities generally. Seatrain appeared and moved to vacate and rescind the Commission's order to reopen the proceedings on the ground that the Commission was without statutory authority to make the alteration proposed. Seatrain's motion was rejected. At the subsequent hearing on the proposed modification, Seatrain declined to offer evidence, resting its case entirely on the Commission's lack of authority to reconsider and alter the original certificate. After argument, the Commission entered an order canceling the former certificate and directing that a different one be issued. 260 I. C. C. 430. The proposed new certificate in effect deprived Seatrain of the right to carry goods generally between the ports it served, and limited it to operations only "as a common carrier by the 'seatrain' type of vessels, in interstate or foreign commerce, in the transportation of liquid cargoes in bulk; of empty railroad cars; and of property loaded in freight cars received from and delivered to rail carriers and transported without transfer from the freight cars between the ports of New York, N. Y., New Orleans, La., and Texas City, Tex."

Seatrain then brought this action before a three-judge District Court under 28 U. S. C. §§ 41 (28), 47, to set aside the Commission's order. The District Court set aside the order on the ground that the Commission had exceeded its statutory authority in reopening the pro-

ceeding and altering the certificate. The District Court further held that even if the Commission would have had power under different circumstances to alter a certificate, it should not have done so in this case where, as the Court found from evidence before it but which had not been before the Commission, Seatrain had expended large sums of money in reliance upon the complete validity of its certificate. 64 F. Supp. 156. We need not consider the Commission's objection to the District Court's admission of evidence not heard by the Commission since we agree with the District Court that the Commission was without authority to cancel this certificate.

In altering Seatrain's certificate, the Commission held that a certificate authorizing the carriage of "commodities generally" does not embrace the right to carry loaded or unloaded railroad cars; that consequently the original certificate granted Seatrain actually deprived it of any future right to carry railroad cars—its chief business; that issuance of the original certificate to carry commodities generally was consequently an inadvertent error, patent on the face of the record, which the Commission has the right and power to change at any time the matter comes to its attention. But Seatrain argues that, far from restoring the right to which it was entitled under the original proceedings, the new order actually results in a drastic limitation on the nature of the equipment and service Seatrain is privileged to employ in loading and carrying freight, and could bar delivery or receipt of freight to or from any consignees except railroads.

We need not determine the Commission's statutory power to correct clerical mistakes, since we are persuaded from Seatrain's applications for its certificates, from the information supplied to the Commission indicating that Seatrain had long transported goods of all kinds loaded in freight cars to consignees other than railroads, from the findings of the Commission, and from the course of

the earlier decisions of the Commission regarding Seatrain, that the issuance of the original certificate was not an "inadvertent" error which the Commission's subsequent action was intended to correct. For all these indicate that prior to and at the time of the issuance of the Seatrain certificate it was the understanding of Seatrain and the Commission that its transportation of "commodities generally" included carriage of freight cars and that carriage of freight cars would not exclude carriage of commodities generally. Moreover, the Seatrain application was not reopened for consideration by the Commission until its decision in *Foss Launch & Tug Co.*, 260 I. C. C. 103, decided December 18, 1943. There the Commission pointedly ruled for the first time that a certificate to carry "commodities generally" did not authorize water carriage of loaded or unloaded freight cars—so-called "car-ferry service." Thus it seems apparent that the Seatrain proceedings were reopened not to correct a mere clerical error, but to execute the new policy announced in the *Foss* case. This conclusion is supported by the fact that in prior proceedings involving Seatrain, the Commission had rejected the contention that Seatrain's vessels could be classed as "car ferries," and had concluded that they were ocean-going water carriers.[2]

Since the proceedings apparently were not reopened to correct a mere clerical error but were more likely an effort to revoke or modify substantially Seatrain's original certificate under the new policy announced in the *Foss* case, the question remains whether the Act authorizes such alterations. The water carrier provisions are part of the general pattern of the Interstate Commerce Act which grants the Commission power to regulate railroads and

---

[2] See *Investigation of Seatrain Lines, Inc., supra; Seatrain Lines, Inc.* v. *Akron, C. & Y. R. Co.*, 226 I. C. C. 7; *Hoboken Manufacturers' R. Co.* v. *Abilene & Southern R. Co.*, 248 I. C. C. 109, but see Commissioner Patterson dissenting, *id.* at 120.

**430**

motor carriers as well as water carriers.[3]  The Commission is authorized to issue certificates to all three types of carriers.  But it is specifically empowered to revoke only the certificates of motor carriers.  Section 212 (a), Part II, Interstate Commerce Act, 49 Stat. 555, 49 U. S. C. § 312 (a).  In fact, when the water carrier provisions were pending in Congress, the Commission's spokesman, Commissioner Eastman, seems specifically to have requested the Congress to include no power to revoke a certificate.  The Commissioner explained that while the power to revoke motor carriers' certificates was essential as an effective means of enforcement of the motor carrier section, it was not necessary to use such sanctions in the regulation of water carriers.[4]  It is contended nonetheless that the Commission has greater power to revoke water carrier certificates, where Congress granted no specific authority at all, than to cancel and revoke motor carrier certificates, where specific but limited authority was granted.  But in ruling upon its power to revoke motor carrier certificates, the Commission itself has held that unless it can find a reason to revoke a motor carrier's certificate, which reason is specifically set out in § 212 (a), it

---

[3] 24 Stat. 379 (as amended), 49 U. S. C. § 1 *et seq.* (railroads); 49 Stat. 543, 54 Stat. 919, 49 U. S. C. § 301 *et seq.* (motor carriers); 54 Stat. 929, 49 U. S. C. § 901 *et seq.* (water carriers).

[4] Commissioner Eastman, Chairman of the Commission's Legislative Committee, reporting to the Senate Committee on Interstate Commerce on S. 2009 on January 29, 1940, stated, "This bill leaves section 212 (a) unchanged, and has no corresponding provision in the new part III.  While there is room for argument, we are inclined to believe that provision for the revocation or suspension of water carrier certificates or permits is not essential, if adequate penalty provisions are provided for violations of part III.  Revocation or suspension, in the case of motor carriers, is believed to be the most effective means of enforcement, since there are so many such carriers, and the operations of the great majority are so small, that enforcement through penal actions in courts presents many practical difficulties; but this should not be true of water carriers."

cannot revoke such a certificate under its general statutory power to alter orders previously made. *Smith Bros. Revocation of Certificate,* 33 M. C. C. 465.

It is argued, however, that this proceeding does not effect a partial revocation of Seatrain's certificate, but is merely an exercise of the Commission's statutory power under § 309 (d) to fix "terms, conditions, and limitations" for water carrier certificate holders. Whether the Commission could, under this authority, have imposed a restriction in an original certificate as to the type of service a water carrier could utilize to serve its shippers best is by no means free from doubt. Yet the alleged authority to alter a certificate after it has been finally granted so as to limit the type of service is certainly no greater than the Commission's authority to limit the type of service when issuing the original certificate. It is of some significance that § 208, which prescribes the authority of the Commission in granting certificates to motor carriers, authorizes the Commission to "specify the service to be rendered" by those carriers. But § 309, which empowers the Commission to grant certificates to water carriers, does not authorize the Commission to specify "the service to be rendered." Furthermore, § 309 (d), relating to water carrier certificates, specifically provides "That no terms, conditions, or limitations shall restrict the right of the carrier to add to its equipment, facilities, or service within the scope of such certificate, as the development of the business and the demands of the public shall require . . ." The language of this section would seem to preclude the Commission from attaching terms and conditions to a certificate which would deprive the public of the best type of service which could be rendered between ports by a water carrier. In view of this difference between the statutory authority of the Commission to prescribe the service of water carriers and of motor carriers, our decisions relating to the Commission's power as to motor carriers in this

respect [5] are not controlling as to the Commission's power to regulate the details of the service of water carriers. We can find no authority for alteration of Seatrain's certificate from the Commission's power to fix "terms and conditions."

Nor do we think that the Commission's ruling was justified by the language of § 315 (c) which authorizes it to "suspend, modify, or set aside its orders under this part upon such notice and in such manner as it shall deem proper." That the word "order," as here used, was intended to describe something different from the word "certificate" used in other places, is clearly shown by the way both these words are used in the Act. Section 309 describes the certificate, the method of obtaining it, and its scope and effect, but it nowhere refers to the word "order." Section 315 of the Act, having specific reference to orders, and which in subsection (c), here relied on, authorizes suspension, alteration, or modification of orders, nowhere mentions the word "certificate." [6] It is clear that the "orders" referred to in § 315 (c) are formal commands of the Commission relating to its procedure and the rates, fares, practices, and like things coming within its authority. But, as the Commission has said as to motor carrier certificates, while the procedural "orders" antecedent to a water carrier certificate can be modified from time to time, the certificate marks the end of that proceeding. [7] The certificate, when finally granted and the time fixed for rehearing it has passed, is not subject to revocation in whole

---

[5] *Chicago, St. P., M. & O. R. Co.* v. *United States,* 322 U. S. 1; *Crescent Express Lines* v. *United States,* 320 U. S. 401; *Noble* v. *United States,* 319 U. S. 88. See also *Smith Bros. Revocation of Certificate,* 33 M. C. C. 465; *Quaker City Bus Co.,* 38 M. C. C. 603.

[6] And §§ 316 and 317 of the Act pointedly treat an order as one thing and a certificate as another.

[7] See *Smith Bros. Revocation of Certificate, supra, Quaker City Bus Co., supra.*

or in part except as specifically authorized by Congress. Consequently, the Commission was without authority to revoke Seatrain's certificate. That certificate, properly interpreted, authorized it to carry commodities generally, including freight cars, on the routes for which the certificate originally issued. The judgment of the District Court is

*Affirmed.*

MR. JUSTICE RUTLEDGE concurs in the result.