PUBLIC UTILITIES COMMISSION OF CONN. v. FEDERAL POWER COMMISSION et al.

No. 10898.

United States Court of Appeals Third Circuit.

Argued April 24, 1953.

Decided June 15, 1953.

William L. Beers, New Haven, Conn., William R. Connole, Hartford, Conn., for appellant.

Bernard A. Foster, Jr., Washington, D. C. (Bradford Ross, General Counsel, William L. Brunner, Pascal B. Frazier, Federal Power Commission, Washington, D. C., on the brief), for Federal Power Commission.

Christopher T. Boland, Washington, D. C. (Richard J. Connor, Walter E. Gallagher and William L. Shea, Washington, D. C., James B. Henderson, Houston, Tex., on the brief), for Transcontinental.

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

STALEY, Circuit Judge.

Asserting that it is aggrieved, the Public Utilities Commission of the State of Connecticut is here seeking review, under section 19(b) of the Natural Gas Act,[1] of an order of the Federal Power Commission. The case is a manifestation of the growing pains being felt upon the introduction of natural gas into the New England area.

On September 9, 1949, Transcontinental Pipe Line Corporation applied to the respondent Commission in Docket No. G–1277 for a certificate of public convenience and necessity authorizing it to construct and operate 35.5 miles of 24-inch line from a point in northern New Jersey to a point near Greenwich, Connecticut. Through these facilities, Transcontinental proposed to sell 100,000 Mcf of natural gas per day to Northeastern Gas Transmission Company.

In Docket No. G–1267, Northeastern applied for a certificate authorizing, among other things, construction and operation of 144 miles of 20-inch line from a point near Pittsfield, Massachusetts, extending in an easterly direction to a point near Boston and 100 miles of 16-inch line from a point near Greenwich to a point near Springfield, Massachusetts.

In Docket No. G–1248, Tennessee Gas Transmission Company, parent of Northeastern, requested authority, among other things, to increase the capacity of its pipeline system, to extend its line from its then terminal near Buffalo to a point of connection with Northeastern's proposed line near Pittsfield, Massachusetts, and to sell to Northeastern 156,000 Mcf of natural gas per day.[2]

The matters described above were set down for a consolidated hearing, after which the Commission issued its Opinion No. 202 and order of November 8, 1950. So far as relevant here, that order granted a certificate authorizing Transcontinental's construction and operation of the 35.5 miles of line from northern New Jersey to a point near Greenwich, Connecticut, upon condition that it sell and deliver to Northeastern not more than 64,000 Mcf of natural gas

1. 52 Stat. 831 (1938), 15 U.S.C.A. § 717r (1948).

2. The general background of these and related proceedings is discussed in our decision in Northeastern Gas Transp. Co. v. Federal Power Commission, 3 Cir., 1952, 195 F.2d 872.

per day. That order also authorized Northeastern to construct its proposed lines in order to serve the various New England states, Connecticut being one of them. Tennessee was certificated to construct its proposed extension from Buffalo to Pittsfield, Massachusetts, and to supply 156,000 Mcf per day to Northeastern to enable the latter to supply its extended facilities. Nobody here finds fault with any of the phases of this order.

Tennessee completed its extension and made its first delivery to Northeastern in September of 1951. After some difficulties, Northeastern completed its new lines and delivered natural gas into the pipes of the Connecticut Power Company, Torrington Division, in August of 1952—about one year later than anticipated. Following its authorization, Transcontinental contracted with Northeastern on March 15, 1951, to sell the latter 64,000 Mcf per day, deliveries to begin by September 1, 1951. The parties' hopes, however, did not materialize. Transcontinental encountered financing and procurement trouble. In June of 1951, it discovered that the cost of its proposed lateral to New England would exceed the original estimate by about six and one-half million dollars. Its president said that, for this reason, it was unable to raise the funds to build the proposed extension. Moreover, Transcontinental did not have pipe available and was faced with litigation in attempting to acquire a site for a compressor station at Rye, New York. This situation was explained to Northeastern, which company stated that it would be unable to accept deliveries of gas until about September of 1952. Transcontinental then advised Northeastern that it had terminated the contract of March 15, 1951, but proffered new contractual arrangements looking to deliveries in September of 1953. Northeastern then advised Transcontinental that it considered that Transcontinental had breached the contract, and it declined to enter into further agreements with Transcontinental.

Being apprised of these facts, the Commission on December 7, 1951, reopened Docket No. G–1277 to determine what disposition should be made of the unused 64,000 Mcf of Transcontinental's authorized capacity. On February 19, 1952, Transcontinental filed a petition requesting modification of the order of November 8, 1950, by rescission of the authority granted it to construct the 35.5 miles of pipe line to Greenwich and to sell 64,000 Mcf to Northeastern. The latter answered, stating that it had no objection to the granting of the petition.

The Commission consolidated proceedings on Transcontinental's petition with those on reopened Docket No. G–1277. Petitioner was allowed to intervene after the date for timely intervention.

Hearings were held and thereafter the Commission issued its order of June 19, 1952. That order is the one to be reviewed here. It amended the order of November 8, 1950, by revoking Transcontinental's authority to construct the lateral to Greenwich and to sell 64,000 Mcf to Northeastern. Simultaneously, the Commission granted a certificate to Tennessee, pursuant to its petition in Docket No. G–1573, authorizing sale by it to Northeastern of 64,000 Mcf per day, in addition to the 156,000 authorized by the order of November 8, 1950. Although the order under attack allowed Transcontinental to drop out of the picture, the 64,000 Mcf which it was to supply was ordered to be supplied by Tennessee. Consequently, the changed order did not affect the quantity of natural gas to be furnished to Northeastern and, through the latter's facilities, to Connecticut. This preliminary observation serves to highlight petitioner's principal allegation of aggrievement. Petitioner says that, by the order of November 8, 1950, Connecticut was to get a certain volume of gas through two sources of supply; by the order of June 19, 1952, it gets the same volume of gas but through only one source of supply; therefore, instead of receiving natural gas from the reserves of both Transcontinental and Tennessee, its supply is dependent on the reserves of Tennessee alone. Furthermore, should a break occur in Tennessee's line, Connecticut will be without gas, whereas, if it were served by two lines, as originally ordered, the deficit caused by a break in one

line could be picked up by the other until the break was repaired.

We are met at the outset by a robust attack upon petitioner's standing to prosecute this review. Both respondents argue with much force that petitioner is not a party aggrieved within section 19(b) of the Natural Gas Act.[3] We think there are other issues dispositive of this case, and, therefore, we will pass over this "complicated specialty of federal jurisdiction." U. S. ex rel. Chapman v. Federal Power Commission, 1953, 345 U.S. 153, 156, 73 S.Ct. 609, 612. We will assume for the purposes of this case, without deciding, that petitioner is a party aggrieved and, thus, has standing to challenge this order.

■ Petitioner's main contention here is that the order under review is fatally defective for its failure to contain the necessary findings. An administrative order must contain an express finding of the ultimate fact upon which the organic statute requires the agency action to be predicated. The cases on the point are legion. Indicative examples are Mahler v. Eby, 1924, 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549 (Secretary of Labor may not deport a person without first making an express finding that he is an "undesirable resident"); City of Yonkers v. United States, 1944, 320 U.S. 685, 64 S.Ct. 327, 333, 88 L.Ed. 400 (Interstate Commerce Commission may not authorize abandonment of part of a railroad line without expressly finding that that part was not "operated as a part * * * of a general steam railroad system of transportation"). Here, however, the Commission made the talismanic finding that its revocation of Transcontinental's authority was in the interest of "public convenience and necessity." It is also settled that an administrative order must contain express findings of the basic facts upon which the expressed, ultimate fact must be supported. United States v. Carolina Freight Carriers Corp., 1942, 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971. "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." United States v. Chicago, M., St. P. & P. R. R.,

1935, 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023.

■ Petitioner, relying on the latter rule, contends that the Commission has failed to disclose the facts and reasoning it employed in concluding that public convenience and necessity compelled its determination to revoke Transcontinental's certificate. We do not agree. The Commission recited the facts showing that Transcontinental's contract with Northeastern looked towards completion of its facilities and delivery of natural gas to the latter by September 1, 1951; that the financing and procurement difficulties which we have set out above made it perfectly evident that Transcontinental was unable to raise the funds to build the proposed lateral; that Transcontinental had no intent to proceed with the project; and that it would be futile to attempt to compel it to do so. Following this, it was found that, if Northeastern were deprived of the supply from Transcontinental, Northeastern's ability to serve its customers would be impaired. To avoid that impairment, the Commission then noted that it was issuing a certificate authorizing Tennessee to supply 64,000 Mcf per day to Northeastern. In view of all these factors, the Commission then concluded that public convenience and necessity compelled its determination to revoke Transcontinental's certificate. The following is a reasonably accurate précis of the Commission's reasoning: As originally contemplated, Transcontinental was to begin deliveries to Northeastern in 1951. As of December of that year, there was every indication that, because of financial difficulties, it was not going to perform then or within the foreseeable future. Northeastern, already certificated to serve New England, had to have gas from some source. Tennessee was ready, willing, and able to supply that need, but that market was allocated to Transcontinental. Therefore, in order to allow Tennessee to move in, it was necessary that Transcontinental move out. This would insure an adequate, prompt supply of gas to New England. Hence, the Commission's order was for the public con-

3. Note 1, supra.

venience and necessity. We think that is all that can be asked of any administrative agency. "[T]he Commission is not compelled to annotate to each finding the evidence supporting it." United States v. Pierce Auto Freight Lines, Inc., 1946, 327 U.S. 515, 529, 66 S.Ct. 687, 695, 90 L.Ed. 821. At the very least, the Commission's order here is sufficiently clear that " * * the path which it followed can be discerned." Colorado Interstate Gas Co. v. Federal Power Commission, 1945, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206. "There is no requirement that the Commission * * * disclose mental operations by which its decisions are reached." Baltimore & Ohio R. R. v. United States, 1936, 298 U.S. 349, 359, 56 S.Ct. 797, 803, 80 L.Ed. 1209.

Nor do we think the Commission failed to consider the economic feasibility of the revocation. As we read the order, it is clear enough that Transcontinental's financing difficulties made the pipe line construction economically infeasible. Furthermore, the Commission did not neglect the factor of the advantage to New England of a dual source of supply. As matters stood, however, regardless of such manifest advantage, New England simply was not getting a dual source of supply.

Next, we are told that the Commission has not indicated the section of the Act under which it derives authority to enter this order and, consequently, that the reviewing court is unable to ascertain the proper standards to be followed. We think this is an unduly narrow approach. Under section 7(e) of the Act, the Commission has " * * * the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require." [4] The certificate granted to Transcontinental, which was revoked by the order under review, was expressly made subject to the conditions that Transcontinental deliver and

sell to Northeastern 64,000 Mcf per day, submit rate schedules satisfactory to the Commission, and submit progress and completion reports. The record made before the Commission shows Transcontinental's inability to build the pipe line and, therefore, its anticipatory failure to comply with the conditions of its certificate. Simple logic would seem to indicate that the power to attach conditions to a certificate includes the power to revoke the certificate for failure to satisfy the conditions. Therefore, section 7(e) would authorize this order. The order, however, did not rest on these inarticulate conclusions. It is true that the order itself does not state the statutory source of authority. Transcontinental's petition, however, invoked section 16 of the Act, the pertinent part of which is as follows:

"The Commission shall have the power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter." [5]

That section expressly grants authority to do what we think section 7(e) authorized implicitly. Having been invoked by Transcontinental, we think it evident that the Commission relied on section 16. That it was equally clear to petitioner is evidenced by the fact that at no time during the hearing nor in petitioner's request for rehearing was the present objection raised. Moreover, in its petition for rehearing and in its brief, petitioner recognizes and argues that the Commission may revoke Transcontinental's certificate for failure to comply with the attached conditions.

Finally, petitioner asserts that the Commission erroneously concluded that it was powerless to refuse to grant Transcontinental's petition. Initially, it must be pointed out that the Commission made no such conclusion. It said it would be futile to attempt to require Transcontinental to

4. 56 Stat. 84 (1942), 15 U.S.C.A. § 717f (e) (1948). United States v. Seatrain Lines, Inc., 1947, 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396, relied on by petitioner, is inapposite. The result there depended upon construction peculiar to the water-carrier provisions of the Interstate Commerce Act.

5. 52 Stat. 830 (1938), 15 U.S.C.A. 717o (1948).

construct the lateral. There is a difference, and it is vital. The Commission was not construing its statutory power to enter an order refusing the petition. Considering the order as a whole, it seems reasonably clear to us that the Commission assumed it had the power to deny the petition and even to order Transcontinental to build the lateral. If Transcontinental was without the money to build the line, however, no matter what order was entered, the line would not get built. Therefore, it would be futile to try to compel Transcontinental to proceed.

Having concluded that the Commission had the power to do what it did and that it acted fairly in doing so, we cannot concern ourselves with the policy factors bearing on whether it should have done so. "The problem of the allocation of service to various customers is one which calls for judgment within the Commission's peculiar and expert competence." Michigan Consolidated Gas Co. v. Federal Power Commission, 3 Cir., 203 F.2d 895.

We think the other points raised by petitioner are without merit.

The order of the Federal Power Commission will be affirmed