UNITED STATES of America, Appellant,

v.

Norman KOPF et al., Appellees.

No. 18651.

United States Court of Appeals
Eighth Circuit.

June 28, 1967.

Robert V. Zener, Attorney, Dept. of Justice, Washington, D. C., for appellant; Barefoot Sanders, Asst. Atty. Gen., Dept. of Justice, and Alan S. Rosenthal, Attorney, Dept. of Justice, Washington, D. C. and Theodore L. Richling, U. S. Atty., Omaha, Neb., on the brief.

John Wightman, of Smith Brothers, Lexington, Neb., for appellees; Bernard B. Smith of Smith Brothers, Lexington, Neb., on the brief.

Before VAN OOSTERHOUT, BLACKMUN and LAY, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

The defendant, United States of America, has appealed from judgment of the District Court awarded plaintiffs for $3924.34 as a balance due them for their participation in the 1962 and 1963 Feed Grain Programs established under the Soil Conservation and Domestic Allotment Act, 16 U.S.C.A. § 590a et seq.

The Government filed a motion for summary judgment; plaintiff filed a cross-motion for summary judgment. The Government's motion was overruled; plaintiff's motion was sustained. Stipulation was filed fixing the amount plaintiffs were entitled to recover in event they prevailed. Judgment was entered for such amount. No contention is made upon this appeal that material issues of relevant fact are in dispute.

Jurisdiction existed in the District Court under 28 U.S.C.A. § 1346(a) (2). See Aycock-Lindsey Corp. v. United States, 5 Cir., 171 F.2d 518.

The primary issue presented is whether the Secretary of Agriculture under the applicable statutes and regulations can alter a crop yield determination which has become final and binding as to the producer after the producer has substantially participated and complied with the program. The trial court in a well-reasoned (unreported) opinion sets out the pertinent facts, the applicable statutes and regulations, and the basis for its conclusion that such redetermination of yield cannot be made. We affirm.

Many statutes and regulations have been adopted governing the varying feed-grain programs that have been in operation for many years. The language of the statutes and regulations operative as to programs for particular years vary somewhat. We are here concerned with corn yield determinations with respect to the 1962 and 1963 programs. The feed-grain programs for such years are authorized by 16 U.S.C.A. § 590p (d) and (g). Provision for reduction of corn acreage and benefit payments to the producers for compliance is made. The program is a voluntary one. Payments to

producers who participate in diverting corn acreage are authorized. Important considerations in determining benefits to be paid producers are the corn acreage allotments, the acres diverted and the yield. Only the yield is here in controversy. Section 590p (d) and (g) each provides that the yield is to be determined upon the basis of adjusted average yield per acre, and, inter alia, provides: "To the extent that a producer proves the actual acreages and yields for the farm for the 1959 and 1960 crop years, such acreages and yields shall be used in making determinations." Such provisions are repeated in substance in 7 C.F.R. 775.117 and 775.216. These regulations give the producer the right to apply to the county committee for reconsideration of yield and other determinations within fifteen days of receipt of Form 471 notice.

The regulations relating to the 1962 program appear in 7 C.F.R. 775.101 to .177 and those of the 1963 program in 7 C.F.R. 775.201 to .228.

Average yields by counties and payment rates are set out for 1962 at 7 C.F.R. 775.152 and for 1963 at 7 C.F.R. 775.228. Such average yield for Dawson County, Nebraska, the county here involved, was fixed at 70.5 bushel for each year. It is apparent that the various farms in the county will vary as to production. The regulations contemplate that yields and productivity indexes be initially established by the County ASC Committee. 7 C.F.R. 775.104; 7 C.F.R. 775.204. Notice of the determinations by the county committee shall be mailed to the producers on Form 471. 7 C.F.R. 775.116 and 7 C.F.R. 775.215. Form 471 contains all of the factual determinations which the county committee is required to determine by the regulations and such determination affords the basis for mathematical calculations as to the benefits to be paid for participation in the program.

Plaintiffs Norman Kopf and Harold Kopf operated two farms in Dawson County, Nebraska, eligible to participate in the corn program, the farms being known in the record as L-60 and L-61. On March 2, 1962, the County ASC Committee, pursuant to the statutes and regulations, issued and mailed to plaintiffs Form 471 establishing a corn yield of 71 bushels per acre on L-60 and 79 bushels per acre on L-61.

Plaintiffs timely exercised their legal right to request a redetermination of the 1962 yield as fixed by the county committee. An evidentiary hearing was held before the committee at which evidence was introduced, after which the committee redetermined the corn yield at 118 bushels per acre for each farm upon the basis that the evidence introduced established such yield for the years 1959 and 1960. New notices on Form 471 were mailed to plaintiffs on May 9, 1962, fixing the yield of each farm at 118 bushels per acre. No proceedings for further appeal or review were taken by either the producer or the Government or any agency thereof. Upon the basis of such yield redetermination made pursuant to law, plaintiffs filed with the county committee with respect to each farm for the year 1962 Form 477 entitled, "Intention to Participate and Application for Advance Payment," which were approved by the county committee. Such form contains computation of the payments to plaintiffs on the basis of the 118 bushels per acre yield. The yield is an important factor in determining the amount to be paid. Plaintiffs fully complied with the 1962 program and were in regular course paid the benefits provided for as stated in Form 477. Subsequently in 1963 the portion of the 1962 payment based upon the increased yield allowed as a result of the redetermination was offset against the sums due to plaintiffs for their participation in the 1963 program.

With respect to 1963, the County ASC Board in the performance of the duties imposed upon it by the Act and regulations and without any affirmative action on the part of the plaintiffs fixed the corn yield for 1963 as to each farm at 118 bushels and so notified the plaintiffs on Form 471. No reconsideration of the 1963 yield was sought by plaintiffs or

any one else. Thereafter, plaintiffs filed compliance Form 477 and fully complied with the 1963 program.

The first notice which plaintiffs received of any intent or movement upon the part of the Secretary or his representatives to alter the yields previously determined for the years 1962 and 1963 was in the form of a letter from the county committee reading as follows:

"During our recent audit, an exception was discovered in regard to our documentation of evidence furnished by you in support of the increase in yield granted you by this office on your farms for the 1962 and 1963 Feed Grain Programs.

"In view of this, it will be necessary that you resubmit to this office for reappraisal and documentation the evidence used for the 1959 and 1960 crop years on which the increase was based on the farm numbers listed above.

"Types of evidence used, which will be used again, are warehouse receipts, sales receipts, loan documents, assessors records, and other tax receipts, plus other available, reliable evidence which you possess that can be considered.

"A meeting at this office has been arranged for you on Monday, June 3, 1963, 9:30 a. m. to 10:10 a. m., at which time the above indicated evidence may be presented. * * * "

Plaintiffs appeared before the committee pursuant to such notice and resubmitted their available evidence. On August 6, 1963, plaintiffs were advised by the Board that Plaintiffs' evidence was accepted except with respect to the amount of corn used for feed and that the yields for 1962 and 1963 were set as first established for 1962 at 79 bushels per acre for farm L-61 and 71 bushels for farm L-60, and demand was made for repayment of benefits paid for 1962 in the amount of $1290.16 on farm L-61 and $535.68 on farm L-60. Such is the difference between the amount payable on the 118 bushel yield as redetermined and the reduced yield adopted in the Board's letter of August 6, 1963. The 1963 payments were also adjusted on the basis of the reduced yields.

Upon timely appeal, the State committee upheld the reduction made by the county committee and upon appeal to the Deputy Administrator, relief was denied on May 28, 1964—more than two years after the 1962 yield had been redetermined and more than one year after the yield had been fixed for 1963 by the County Board.

■ Plaintiffs base their contention that the 1962 and 1963 yield determinations shown by the Form 471 notices are final under 7 U.S.C.A. § 1385, which reads:

"The facts constituting the basis for any payment under the Soil Conservation and Domestic Allotment Act, as amended, parity payment, payment under section 1339 of this title, loan, or price support operation, or the amount thereof, when officially determined in conformity with the applicable regulations prescribed by the Secretary or by the Commodity Credit Corporation, shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government. * * * "

We believe that such statute applies to our factual situation. As to 1962, as heretofore shown, the 118 bushels per acre yield was established upon plaintiffs' application for reconsideration after a full evidentiary hearing, whereupon a new Form 471 for 1962 was issued fixing the 118 bushel yield for each farm. Such proceeding was authorized by the regulations and there is no showing that the original hearing did not fully conform to the regulations. No appeal having been taken by the producer, the decision is final as to him. See Gajewski v. United States, 8 Cir., 327 F.2d 239, 242; Weir v. United States, 8 Cir., 310 F.2d 149, 157.

■ Fairness requires that a decision final as to one party should also be final as to the other, absent clear statutory authority to the contrary. Section 1385 accomplishes this objective.

Seven C.F.R. 775.226, applicable to 1963 with no counterpart for 1962, authorizes a state committee to correct action taken by the county committee which is not in accordance with regulations. Such regulation is of no help to the Government as there is no showing the county committee's determination upon the producers' application for reconsideration was not in strict accord with the regulations.

Seven C.F.R. 775.117(a) and 775.216(a), which authorize correction of mechanical or clerical errors that arise solely from action of the county or state committee representatives has no application in our present case as no mechanical or clerical errors are alleged or shown.

It is true, as alleged by the Government, that 7 C.F.R. 775.128 and 775.227 each provides:

"No delegation herein to a State or county committee shall preclude the Administrator, ASCS, or his designee, from determining any question arising under the program or from reversing or modifying any determination made by a State or county committee."

The Government's reliance upon such regulation is well answered by the trial court as follows:

"Essentially, the issue presented therefore, is the interpretation of §§ 775.128 and 775.227 of the regulations. The Government has taken the position that under these sections the Secretary has the power to change a determination after performance has been started or even completed. The Court finds it hard to believe that such a situation was ever intended by Congress or by the Secretary. It is inconceivable that the offers on Forms 471 were not at least meant to become a binding unilateral contract on the part of the Government once a participating farmer had started performance. Any other position would place the farmer at the complete mercy of the government. If the government's position was accepted it is unlikely that any farmer would ever enter into such a program."

We agree with the trial court that the interpretation urged by the Government of the regulations just quoted is inconsistent with the provisions of the governing statutes and regulations as a whole. Without doubt under such regulations the Secretary maintains some supervisory power over the actions of his subordinates but in our view, such power does not go to an issue such as we have here which has been finally determined after an evidentiary hearing held pursuant to the regulations.

It is noteworthy that despite the long period of time farm programs have been in effect no authority is cited or found supporting the Government's position that it may open up a factual determination at any time, however remote. Such position is inconsistent with all rules of administrative and judicial procedure.

In rejecting a contention similar to that here made, Gladney v. Review Committee, W.D.La., 257 F.Supp. 57, 60-61, holds:

"It seems well settled that the County Committee, as an administrative agency, cannot retroactively revise allotments without an express congressional grant of such power. Civil Aeronautics Board v. Delta Air Lines, 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed. 869 (1961); Unted States v. Seatrain Lines, 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396 (1947); Pan American Petro. Corp. v. Pierson, 284 F.2d 649 (10 Cir. 1960), cert. denied 366 U.S. 936, 81 S.Ct. 1661, 6 L.Ed.2d 848.

\* \* \* \* \* \*

"Since in this case there was no appeal filed from the revised determination of 1964 or the original determinations of 1965 and 1966, and there is obviously no issue of fraud or misrepresentation, the determinations were final as to both the administrative agency and the farmer."

The Supreme Court in Civil Aeronautics Board v. Delta Air Lines, Inc., 367 U.S. 316, 334, 81 S.Ct. 1611,

1623, 6 L.Ed.2d 869, in denying the Board a right to make a redetermination of a factual issue, states:

"In short, we do not find that prior authority clearly favors either side; however, to the extent that a broad observation is permissible, we think that both administrative and judicial feelings have been opposed to the proposition that the agencies may expand their powers of reconsideration without a solid foundation in the language of the statute."

Farmers, before determining whether to participate in a program such as this, carefully weigh the benefits offered for compliance against the crops lost by diverting corn acreage. Without firm assurance from the Government before planting time as to payment available for compliance, very few farmers would participate in the program. The trial court specifically determined that no fraud or wilful misconduct on the part of the producers in obtaining the yield determination was either pleaded or established. Under such circumstances, the interpretation contended for by the Government would tend to defeat the purpose of the statute. In our view, no basis exists in the absence of statutory authorization for permitting without limitation a redetermination of the yield under the circumstances of this case.

■ The Government's contention that the right to redetermination should exist because the county committee is composed of local farmers subject to local pressures and because hearings are usually ex parte lacks merit. The Secretary by his regulations has chosen to place the fact-finding responsibility in the county committee as an economical and expeditious means of administering the Act. There is nothing in the record to indicate the county committee did not perform its duty fairly on the basis of the facts before it. There is nothing in the Act or regulations which prevents the Secretary from having a representative at the hearing if he chooses to do so.

■ The Government places considerable reliance upon 7 U.S.C.A. § 1339a which reads:

"Notwithstanding any other provision of law, performance rendered in good faith in reliance upon action or advice of an authorized representative of the Secretary may be accepted as meeting the requirements of subsections (c), (d), (g) and (h) of section 590p of Title 16, * * * and payment may be made therefor in accordance with such action or advice to the extent the Secretary deems it desirable in order to provide fair and equitable treatment." [1]

This statute is clear and unambiguous and by way of liberalization grants the Secretary power under stated circumstances to make payments to producers who would not be entitled thereto under a strict interpretation of the Act where such action is necessary to provide fair and equitable treatment to the producers. It is true, as asserted by the Government, that an example given in the legislative history of this section would allow administrative relief in the present situation. The statute is broad and would apply in many other situations not stated in the legislative history example.

Section 1339a by its terms comes into play only where relief under the Act and regulations would not otherwise be available. It cannot fairly be construed as granting the Secretary a right to redetermine yield after a prior valid determination has become final.

■ Plaintiffs have not invoked the provisions of § 1339a and are specifically disclaiming the applicability of such statute to our present situation. Plaintiffs have consistently maintained that nothing in the applicable feed-grain stat-

---

[1]. The statutory quotation is in the form in effect at the time here pertinent. The statute was broadened by amendment November 3, 1965. (79 Stat. 1192). Such amendment even if applicable would have no effect on the result here.

utes authorizes a redetermination of yield at the late date it was here asserted.[2]

The judgment is affirmed.

2. No proceedings for § 1339a relief appear in the record. All we find is a letter from the deputy administrator to plaintiffs' counsel which does not name the producers involved in the proceedings. Such letter states in part:

"It is apparent that the producers diverted from feed grain production in anticipation of receiving payments based upon yields granted by the county committee. In considering whether the producers acted in good faith and in reliance on the unsupportable proven yields, we have reviewed a report of the projected yield reflecting the average number of bushels of 1959–1960 corn production your clients reported to the county assessor as set forth in his records. In no case did the yield reflected by the assessor's records exceed the feed grain yield, as corrected,

for the 1962 and 1963 programs. In most cases the corrected yield substantially exceeded that indicated by the assessor's records.

"In the face of such evidence we have no choice but to assume that the producers must have been well aware that the yields they had obtained on the basis of proof they submitted represented a productive capability and production greatly exceeding that which they had assessed for themselves in reporting for 1959 and 1960 tax purposes."

If this letter relates to the producers here involved, we do not have the evidence upon which the yield redetermination and denial of administrative relief was based. We express no view upon such determination.