**FLORIDA POWER & LIGHT COMPANY and Amoco Production Company, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 77–2869.

United States Court of Appeals, Fifth Circuit.

July 5, 1979.

Peyton G. Bowman, III, Washington, D. C., for Florida Power & Light Co.

William H. Emerson, Chicago, Ill., Carroll L. Gilliam, Wayne W. Whitney, Jr., Washington, D. C., Percy Sandel, James A. Barton, III, New Orleans, La., for Amoco.

Robert R. Nordhaus, Gen. Counsel, F.E. R.C., Philip Telleen, Atty., ·F.E.R.C., McNeill Watkins, II, Washington, D. C., for respondent.

Before BROWN, Chief Judge, GODBOLD and RONEY, Circuit Judges.

RONEY, Circuit Judge:

Although the number of parties to this natural gas case, and the similarity of names, and the interrelation of each with the other, appear as complicated as a Russian novel, both the facts and the issues can be rather simply stated, even though the decision is difficult. This case involves sections 7(c) and 7(e) of the Natural Gas Act, 15 U.S.C.A. §§ 717f(c) and (e).

Amoco Production Company produced natural gas from new offshore wells. It is desired to use that gas to fulfill two old warranty contracts: one with Florida Power & Light Company, for boiler fuel; and one with Florida Gas Transmission Company, for resale to its customers, some of whom used the gas for boiler fuel. Under the Act a certificate of public convenience and necessity is required from the Federal Energy Regulatory Commission to transport gas. 15 U.S.C.A. § 717f(c). For Amoco to get the offshore gas to Florida Gas terminals on shore, from which it then could be transported by Florida Gas, under existing certificates, to Florida Power & Light and to the customers of Florida Gas, certificates of public convenience and necessity were needed. In response to applications for such certificates, the Commission approved the transportation of the gas from the offshore wells to the onshore terminals, but so conditioned the certificates as to

prohibit Amoco from using the gas for the Florida Power & Light boiler fuel contract.

Since the Commission had years ago approved the Florida Power & Light contract, Amoco argues that it could not condition these certificates in such a way as to prevent it from using offshore gas to fulfill the contract. The Commission contends it has the right to condition the certificates as it did under its authority to determine the priority of ultimate users of gas, due to the insufficient supply to meet all needs, and under its stated and approved policy that boiler fuel use has a low priority. Florida Power & Light asserts that even if that is so, the Commission has treated it unfairly because, while prohibiting it from using the gas as boiler fuel, it is permitting the gas to be used for Florida Gas' resale customers to use for boiler fuel.

In view of congressional and judicial decisions that public necessity overrides private concerns in natural gas regulation, we hold first, as a technical matter, that the Commission did not by the action here amend or modify its prior certificates, which it might not have the power to do, and second, that it acted within its authority in imposing the complained of conditions on these new certificates.

Persons having a direct interest in this case are the applicants for the certificates issued by the Commission: Amoco Production Company, a subsidiary of Standard Oil Company of Indiana, Natural Gas Pipeline Company of America, Columbia Gulf Transmission Company, Sea Robin Pipeline Company, Tennessee Gas Pipeline Company, a division of Tenneco, Inc., and Fort Pierce Utilities Authority; and the purchasers of the natural gas covered by the certificates: Florida Power & Light Company (FP&L) and Florida Gas Transmission Company (FGT). Sea Robin Pipeline Company is not a party to this appeal. Another dozen or so parties having a possible interest in the case, but not represented on this review, are listed by counsel. Our reference to Amoco hereafter includes all parties who sought a certificate in this case and in whose interest it might be to reverse the Commission on this review.

Under review is a May 2, 1977 order of the Federal Energy Regulatory Commission imposing conditions on certificates of public convenience and necessity sought by Amoco for the transportation of gas from offshore wells to onshore pipeline terminals. Review is being sought under section 19(b) of the Natural Gas Act, 15 U.S.C.A. § 717r(b). *See Transcontinental Gas Pipe Line Corp. v. F.E.R.C.*, 589 F.2d 186, 188 (5th Cir. 1979).

The applications for certificates of public convenience and necessity filed with the Commission in late 1972 and 1976 were a part of Amoco's continuing program to deliver gas under two warranty contracts with FGT and FP&L approved by the Commission in 1965 and 1967. Underlying these applications are exchange and transportation agreements executed by Amoco and four interstate pipeline companies.[1] These

1. The applications sought certificates under section 7(c) of the Act, 15 U.S.C.A. § 717f(c), authorizing exchange, transportation, and construction and operation of facilities:

(1) In Docket No. CP73–70, Columbia Gulf Transmission Company (Columbia Gulf) filed an application for a certificate authorizing construction and operation of facilities and exchange and transportation of gas for Amoco from certain fields in south Louisiana and the offshore Federal domain, for delivery to FGT at the point where Columbia Gulf's and FGT's pipelines intersect near Judice, Lafayette Parish, Louisiana.

(2) In Docket No. CP73–157, Natural Gas Pipeline Company of America (Natural) filed an application for a certificate authorizing exchange with Amoco in the West Johnson Bayou Field, Cameron Parish, Louisiana, which gas is delivered by Columbia Gulf to the FGT pipeline interconnection near Judice.

(3) In Docket No. CP77–37, Sea Robin Pipeline Company (Sea Robin) filed an application for a certificate authorizing transportation of Amoco's gas from offshore East Cameron Block 264 to the terminus of Sea Robin's pipeline near Erath, Louisiana, where the gas is received by Columbia Gulf and delivered to FGT's pipeline interconnection.

Sea Robin originally filed an application for a certificate authorizing the transportation of Amoco gas from East Cameron Block 264 on November 2, 1971. The Commission issued an order in May 1975 affirming the Administrative Law Judge's Initial Decision which dismissed Sea Robin's application without prejudice. The order stated that the present

agreements were designed to move gas from Amoco's offshore leases to delivery points on FGT's pipeline in south Louisiana, where the gas is taken by FGT and transported to Florida for release to FGT's customers and for use by FP&L.

After evidentiary hearings on the applications and the submission of briefs the Commission issued its May 2, 1977 order granting certificates of public convenience and necessity, but imposing certain conditions on the certificates. Concluding that it would be against the public interest to authorize the use of Federal Domain offshore gas for boiler fuel at a time of natural gas shortage, the Commission's conditions prohibited Amoco from supplying gas for transportation by FGT to FP&L for boiler fuel. Specifically Amoco challenges the following portions of the order:

1. Paragraph H which provides that gas produced from offshore Federal Domain sources "shall be delivered to FGT only in satisfaction of the FGT warranty sale, and none of such gas shall be transported to FPL."

2. Paragraph D which requires Amoco to apply to the Commission for authorization before disconnecting the sources of supply used in the performance of the two warranty contracts.

3. Paragraph E which imposed delivery conditions in terms of field capacity instead of warranty volumes.

The other conditions imposed in the order are not before this Court on this appeal.

It seems clear at the outset that, were it not for the existing Commission-approved warranty sales contracts of Amoco with FP&L and FGT, the conditions on the certificates would have to be approved on this

review. Although Amoco argues that the imposition of the conditions is not supported by substantial evidence, and FP&L argues that it is being treated unfairly vis-a-vis FGT, two issues which are treated later in this opinion, the central argument made on this petition for review is that the Commission's prior approval of the warranty contracts with FP&L and FGT prohibits it from conditioning these certificates so that offshore gas cannot be transported to FP&L for use as boiler fuel in satisfaction of the contracts.

Amoco argues that the action has the legal and practical effect of modifying the final certificates issued in 1965 and 1967 under section 7(c) of the Natural Gas Act. It contends such modification of a final certificate is beyond the statutory authority of the Commission under *United States v. Seatrain Lines, Inc.*, 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396 (1947), and its progeny, and an unlawful attempt to modify a settlement agreement approved by the Commission in 1967 and relied upon by the parties in planning performance of the contracts involved, citing *Texas Eastern Transmission Corp. v. F.P.C.*, 306 F.2d 345 (5th Cir. 1962), *cert. denied*, 375 U.S. 941, 84 S.Ct. 347, 11 L.Ed.2d 273 (1963).

The Commission, on the other hand, contends that the prior certificates have not been amended or modified so as to bring the case within the contours of *Seatrain*, and that in any event, the Natural Gas Act provides and the Commission has long interpreted the Act to allow for amendment of final certificates where required by the public interest. We do not reach the second contention because, in our view, the action of the Commission did not amount to amendment or modification of prior final certificates.

gas supply situation no longer afforded the "luxury" of using natural gas for boiler fuel, in the absence of special circumstances. *See also Sebring Utilities Commission v. F.E.R.C.*, 591 F.2d 1003, 1018 (5th Cir. 1979).

(4) In Docket No. CP77–31, Columbia Gulf and Tennessee Gas Pipeline Company, a Division of Tenneco, Inc. (Tennessee), filed a joint application for a certificate authorizing transportation of Amoco's gas from offshore West Cameron Block 617 to a delivery point

in Vermilion Parish, Louisiana, and/or to a delivery point at the intersection of FGT's pipeline in St. Landry Parish, Louisiana.

(5) In Docket No. CI77–80, Amoco filed, under protest, an application for a certificate authorizing the gas exchange proposed by Columbia Gulf in Docket No. CP73–70.

(6) In Docket No. CI77–81, Amoco filed, under protest, an application for a certificate authorizing the gas exchange proposed by Natural in Docket No. CP73–157.

We discuss the case in these terms: the Commission action was not an amendment or modification of the prior certificates; the Commission's prior actions did not otherwise prevent it from imposing restrictive conditions on the certificates; and the certificate conditions were within its lawful authority.

## DID THE COMMISSION ACTION MODIFY FINAL SECTION 7 CERTIFICATES?

The two warranty contracts which obligate Amoco to supply gas to FGT and FP&L were entered into in November 1964 and March 1965. The FP&L contract was modified in 1967. In June 1965 the Commission granted a certificate to FGT to construct and operate facilities into Florida necessary to transport gas supplied by Amoco to FP&L. In September 1965 the Commission granted a certificate to the predecessor of Amoco, then the Pan American Petroleum Corporation, to sell gas to FGT to perform the two warranty contracts. In reliance on the two warranty contracts, FGT invested 135 million dollars in facilities and construction. By another certificate order issued in May 1967 the Commission approved a settlement [2] respecting modifications of conditions imposed on the use of offshore Federal Domain gas by Amoco in performance of the warranty contract with FP&L. The 1967 modifications agreed to by the parties to the warranty contracts and others and approved by the Commission permitted Amoco to add or withdraw offshore gas supplies, with the limitation that no more than 82% of the gas sold by Amoco to FP&L was to be produced from offshore fields. This provision was applicable to a 10-year period ending in June 1978. The 1977 order under review, however, prohibits connection of new offshore fields for use in connection with the FP&L contract and prohibits disconnection of certain onshore fields from the contracts with FGT and FP&L without prior authorization from the Commission.

### Amoco's Sale to FP&L and the 1967 Certificate

In March 1965 Amoco agreed to supply natural gas to FP&L. FP&L is an electric generating and distribution company operating within the State of Florida. Because of air pollution problems caused by the use of other fuels, FP&L proposed to use gas purchased from Amoco for generating electricity in existing and new plants. The warranty contract governing the sale of this gas contained no commitment or dedication of specific leases or fields and was for a term of 20 years. Amoco's sale of gas to FP&L was not a sale for resale subject to the jurisdiction of the Commission although any interstate transportation of that gas was within Commission jurisdiction.

Pursuant to a warranty contract entered into with Amoco, FGT agreed to transport the gas Amoco sold to FP&L from Louisiana to FP&L's generating facilities in Florida. That transportation service was subject to the provisions of the Act.

In March 1967 at the request of FGT the Commission granted a certificate of public convenience and necessity authorizing FGT to construct and operate additional facilities in order to increase its system capacity for the transportation of additional gas into Florida as a service for FP&L. This order approved Amoco's warranty contract with FGT, and Amoco was authorized by the Commission to supply gas in connection with this service. In approving the FGT warranty contract the Commission noted:

> An important consideration in our decision here flows from the nature of the Florida gas operations which we believe is dictated largely by the unique conditions which prevail in the Florida fuel market. As the Commission recognized

---

2. The May 29, 1967 order of the Commission approved a settlement involving Florida Gas Transmission Company, Pan American Petroleum Corporation (now Amoco), Austral Oil Company, Florida Power and Light Company, and the New York Public Service Commission. The settlement resolved disputes concerning implementation of the March 1967 certificate issued to FGT. See pp. 375–376, infra, for a discussion of the settlement modifications.

in 1956, Florida is a fuel deficiency area and must depend almost entirely on imported fuels . . .. Because of the mild climate which prevails and the low degree-day deficiency the load factor of any pipeline supplying Florida would be relatively low if it were not for the firm industrial transportation of gas as is contemplated here.

In May 1967 the contract with FP&L was modified to provide that after 15 years from the date of initial deliveries, the "warranty" would be deleted and Amoco would have only the obligation to deliver to FP&L production from those wells then connected to FGT's system from which gas had been delivered to FP&L. The May 1967 order of the Commission modified the certificate to provide that up to 82%, instead of 85%, of the gas sold to FP&L could be produced from offshore Louisiana for ten years. As amended by the May 29 order, the condition provided:

> The gas sold by Pan American Petroleum Corporation [now Amoco] and Austral Oil Company [another seller] to FPL under the MMBTU Purchase Contract of March 12, 1965, as amended, shall be produced entirely within the Southern Louisiana area, Mississippi and other down-stream States; that from the date deliveries commence through ten years from such date the proportions of gas produced in the offshore fields (Federal Domain) of Southern Louisiana shall not exceed 82 percent of the total amount of gas produced in the South Louisiana area. The balance of the taxes shall be over the ten-year period. The ratio of the off-shore-onshore takes from the Southern Louisiana area shall be reported to the Commission annually.

This order became final in June 1967 and deliveries to FP&L commenced shortly thereafter.

*Amoco's Sale to FGT Under the 1965 Certificate*

■ FGT operates a major interstate gas pipeline which originates in Texas, follows the coast of the Gulf of Mexico eastward and terminates near Miami, Florida. In addition to transporting to Florida gas purchased in the field by electric generating companies such as FP&L, FGT purchases gas for resale. Such purchases involve a sale in interstate commerce for resale, subject to the jurisdiction of the Federal Energy Regulatory Commission under section 1(b) of the Natural Gas Act, 15 U.S.C.A. § 717(b).

Unlike many gas purchase contracts, the warranty-type contract between Amoco and FGT does not contain a commitment or dedication of specific gas leases or fields to performance of the contract. Instead, the contract provides for sale to FGT of a specific quantity of gas, without reference to source of the gas, with Amoco undertaking a "warranty" that the total quantity will be delivered without specification of sources. The contract was for a term of 20 years.

In a September 1965 order approving the warranty contract the Commission noted that

> [T]he producers who warranted to have the reserves available showed to the satisfaction of the Commission that there were in the area involved either known reserves, estimates of which appeared reasonable, or that current exploration activities in the area justified a conclusion that the total warranted reserves would not be available.

Notwithstanding its authorization of the warranty contract for the sale of gas by Amoco to FGT, the Commission expressed concern about the potential lack of regulatory control over the dedication and/or abandonment of gas reserves under warranty contracts stating:

> The technique has a potential disadvantage in that existing as well as yet undiscovered fields may be attached to a pipeline and abandoned without regulatory action in future years. Here Pan American (now Amoco) has indicated that the sales will be made from two specific fields, at least initially; namely, the North Freshwater Bayou Field and Offshore Block 14 Field. Pan American is (now Amoco) an established company

with a good record of continuing gas exploration and development. In the circumstances, and without intending a broad precedent, we believe the proposed sale may be approved, but a better understanding of the implications of this type of sale may lead to a different view in the future.

To retain some oversight over the gas sales contemplated by the Amoco-FGT warranty contract, the Commission included the following conditions to the certificate:

> (D) The certificate issued by paragraph (A) is subject to the following conditions: (1) At such times as deliveries of gas by applicant to Florida Gas Transmission Company commence from any particular field, Pan American [now Amoco] shall file as a supplement to its related rate schedule, a letter notifying the Commission as to (a) the identity of each particular field involved and (b) the identity of each party whose share of gas produced therefrom is being delivered to Florida, including where applicable, copies of the appropriate instruments of ratification of said contracts by such party or parties;
>
> \*   \*   \*   \*   \*   \*
>
> (3) Pan American [now Amoco] shall file a statement at such time as there is a cessation of deliveries of gas from any particular field notifying the Commission of the identity of the producers involved and the occurrence of cessation of such deliveries;
>
> (4) The sale of gas under this certificate shall be limited to fields or reservoirs located within the south Louisiana area, as defined by the Commission's Statement of General Policy No. 61–1, as amended. In no event shall more than 50 percent of the gas sold under this certificate in any contract year originate from areas outside the tax jurisdiction of the State of Louisiana.
>
> \*   \*   \*   \*   \*   \*

Additionally, the September 1965 certificate provided:

> (C) The grant of the certificate issued in paragraph (A) above   .   .   .   is without prejudice to any findings or orders which have been or may hereafter be made by the Commission in any proceeding now pending or hereafter instituted by or against Applicant. Further, our action in this proceeding shall not foreclose or prejudice any future proceedings or objections relating to the operation of any price or related provisions in the gas purchase contract herein involved.

Amoco accepted the certificate, deliveries commenced, and the order became final.

█   Amoco argues that under 15 U.S. C.A. § 717f(e) of the Natural Gas Act the Commission has authority to attach conditions only at the time a certificate is granted, and the Commission has no authority to alter final certificates. Viewing the 1965 and 1967 certificates as the basis for the necessity for seeking the additional certificates in the proceedings here, Amoco contends the May 1977 conditions unlawfully modify the certificates issued in 1965 and modified with Commission approval in 1967. Amoco asserts it has believed for 10 years that at the expiration of the 10-year 82% limitation it could use offshore gas to satisfy the FP&L contract without further restriction.

In our view, the initial certificates cannot be read as tantamount to a decision on the public convenience and necessity of every subsequent purchase or transportation that might in the future be desired by Amoco to comply with the contracts.

In reaching its decision to impose conditions, the Commission expressly observed that

> When the Commission granted a certificate to Amoco to sell gas to FGT and a certificate to FGT to transport and sell this gas and other gas Amoco would sell to FPL, [it] did not mean that the Commission undertook to grant all certificates necessary for Amoco to carry out its warranty obligations regardless of whether they might not be otherwise in the public interest.

Neither *Civil Aeronautics Board v. Delta Air Lines, Inc.*, 367 U.S. 316, 81 S.Ct. 1611, 6

L.Ed.2d 869 (1961), nor *United States v. Seatrain Lines, Inc.*, 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396 (1947), upon which Amoco relies, requires a merger of the public convenience and necessity decision made in connection with the 1965 and 1967 certificates with that required for the 1977 certificates. Nor do they negate the statutory power and obligation of the Commission to condition certificates of public convenience and necessity as the public interest requires. Neither case fits the circumstances here.

In *Seatrain*, the Interstate Commerce Commission, having issued a certificate to a water carrier, subsequently reopened the certificate proceedings, revoked the certificate, and issued a new one under new terms. By contrast in this case, the Commission expressly refrained from reopening FGT's transportation certificate docket and limited itself instead to the then-pending applications.

In *Delta*, the Civil Aeronautics Board amended an airline route certificate on petitions for reconsideration, without notice or hearing. The amendment precluded Delta from serving cities on a route that had been approved by the original certificate. Rejecting the amendment the Supreme Court said, "all we hold is that the petitions cannot be granted and the certificated carrier's operations curtailed without notice or hearing." *Civil Aeronautics Board v. Delta, supra*, 367 U.S. at 327, 81 S.Ct. at 1620.

In the instant case the Commission followed proper notice and hearing procedures, and the subsequent applications for additional certificates were properly measured against the public necessity as required by 15 U.S.C.A. § 717f(e). Although its imposition of conditions on Amoco's applications for additional certificates undoubtedly affects the manner in which Amoco would thereafter be able to meet its obligations under the warranty contracts, the conditions attached to the issuance of new certificates only involved new sources of gas, and were based on the strain of the gas shortage and the public convenience and necessity, as required by section 7(e) of the Natural Gas Act, 15 U.S.C.A. § 717f(e).

While the 1965 and 1967 certificates may have contemplated that additional fields might be attached to FGT to satisfy the warranty contracts, the Commission did not, and could not, cast off its statutory obligation to judge future applications in light of the public interest at the time of consideration. *See Clark v. Gulf Oil Corp.*, 570 F.2d 1138, 1147 (3d Cir. 1977), *cert. denied*, 435 U.S. 970, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978). That it then intended not to bind itself in future determinations is reflected in the 1967 order, which provided:

> [T]his order is without prejudice to any finding or order which has been, or hereafter may be, entered by the Commission, and is without prejudice to any claim or contention which has been, or hereafter may be, made by the parties, the Commission Staff, or any other person or party affected by this order, in any proceeding now pending, or hereafter instituted.

The new certificates did not modify the old.

Rather than issuing the certificates as if no substantial change had occurred since 1967, the Commission was not foreclosed from taking into account the gas shortage at the time the new certificates were issued 10 years later in 1977. Needless to say, public interests change from time to time. It seems, therefore, improper in a controlled industry to permit private parties to lock out such changes through contracts, albeit approved, which in effect prohibit that controlled industry from responding to those changing interests. Indeed the Commission is not required to approve blindly applications for certificates which may be sought in connection with the performance of long term contracts but is required to approve each such application taking into account current standards of public convenience and necessity. 15 U.S.C.A. § 717f(e).

## DID THE COMMISSION'S PRIOR ACTIONS OTHERWISE PREVENT IMPOSITION OF THE RESTRICTIVE CONDITIONS?

An undercurrent in this case is the suggestion that the Commission has somehow

acted unfairly because its actions in 1977 seemed to renege on what it is deemed to have promised by the 1967 action. We have therefore examined the case to determine if the action of the Commission has been unreasonable because it may seem inconsistent with prior decisions.

The record in this case does not put the question quite as boldly as it is argued. There is nothing to indicate that Amoco will not be able to meet its contract commitments. If it were otherwise, we would address the question anew. But there is no evidence on this record that Amoco will be unable to discover and produce gas from onshore fields to satisfy its obligations under the contracts. If Amoco cannot timely discover and commence production from new onshore fields, it will be forced to purchase gas to meet the warranty obligation to FP&L, probably at a higher cost. Cost alone, however, cannot be a determining factor in a review of the Commission's policy determinations during a natural gas shortage. We do not say that a producer in Amoco's situation could never prevail upon this argument. Amoco cannot prevail on this record.

So far as FP&L is concerned, this record is not as reassuring as it might be respecting Amoco's ability to meet its warranty contract. The availability of the gas to Amoco, say in Texas or North Louisiana, does not get the gas to Florida, where FP&L needs it and obviously expects to receive it. FERC approval of transportation to Florida is required. As in Amoco's situation, in which we recognize that if it cannot meet its contract demands "we would address the question anew," we might have to face the same problem if FP&L itself, or through a pipeline transporter, cannot get the warranty contract gas delivered to it in Florida because of FERC's denial of transportation permits.

The difficulty of rate and supply regulation of natural gas is too well known to require documentation here. It is well established, however, that the overall purpose of the Natural Gas Act is to protect the interest of consumers in an adequate supply of gas and at reasonable rates, *see California v. Southland Royalty Co.*, 436 U.S. 519, 523, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978); *Sunray Mid-Continent Oil Co. v. F. P. C.*, 364 U.S. 137, 147, 151–154, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960); *Clark v. Gulf Oil Corp., supra* at 1145, and that "Congress has delegated under its comprehensive scheme extensive regulatory powers to the Commission in an essential and monopolistic industry to grant certificates of public convenience when the public welfare dictates . . . ." *Id.* at 1149. *See Atlantic Refining Co. v. Public Service Commission*, 360 U.S. 378, 391, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959). When applying the provisions of the Natural Gas Act, courts have consistently recognized that the Act gives the Commission broad authority to limit or proscribe contractual arrangements that contravene relevant public interests. *See, e. g., Permian Basin Area Rate Cases*, 390 U.S. 747, 783–784, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956).

The imposition of conditions in this case by the Commission under 15 U.S.C.A. § 717f(e) must be held to be a reasonable accommodation between the conflicting contractual interests on one hand and public regulation on the other. *See United Gas Pipe Line Co. v. Mobile Gas Service, Corp., supra* at 344, 76 S.Ct. 373.

## WERE THE CONDITIONS WITHIN THE COMMISSION'S LAWFUL AUTHORITY?

Although Amoco argues that the substantial evidence standard of review is applicable, we view the case as one where the policies of the Commission are under attack, and its action can be set aside only if found to be arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. *See Superior Oil Co. v. F. E. R. C.*, 563 F.2d 191, 201 (5th Cir. 1977).

The question is whether the Commission can impose conditions on certificates of public convenience and necessity

which, if upheld, guard the interests of "high priority" users of natural gas at a time of shortage, but make more difficult the performance by Amoco of warranty contracts for the supply of gas to "low priority" users. The Commission has the authority to impose conditions on certificates of public convenience and necessity. 15 U.S.C.A. § 717f(e) provides that "[t]he Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require."

▮ Amoco argues that the Commission's power to attach conditions to a certificate is governed by the substantial evidence standard. *See, e. g., Texaco, Inc. v. F. P. C.,* 290 F.2d 149, 155 (5th Cir. 1961); *California Oil Co., Western Division v. F. P. C.,* 315 F.2d 652, 656 (10th Cir. 1963); *Pure Oil Co. v. F. P. C.,* 292 F.2d 350, 352 (7th Cir. 1961). Recently this Court ruled in *Transcontinental Gas Pipe Line v. F. E. R. C.,* 589 F.2d 186, 190 (5th Cir. 1979), that "[a]ny attack on a condition in a certificate issued by the Commission must confront the well-established principle that generally the Commission has extremely broad authority to condition certificates of public convenience and necessity."

The Commission, in reaching its decision to impose conditions on the certificates of public convenience and necessity sought by Amoco, concluded:

> We are here acting as a matter of policy to conserve natural gas for the most essential uses. Because of the current shortage, which affects most of our actions which respect to natural gas, to permit additional exchanges of gas and the construction and operation of new facilities to enable boiler fuel sales for power plant operation to continue unabated would be perverse in the circumstances and contrary to our policies exercised elsewhere. While in the past we have granted many certificates that involved boiler fuel sales we also refused to do so where the circumstances did not support them. [cases omitted].

Where, as here, the order of the agency orignates in a policy decision and not as an outgrowth of factual determinations, the standard of review is whether the Commission's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Administrative Procedure Act, 5 U.S.C.A. § 706(2)(A); *Superior Oil Co. v. F. E. R. C., supra* at 201. Accordingly, the scope of our review in the instant case is narrow, and the conditions imposed on the certificates of public convenience and necessity must be sustained if they are reasonable under the circumstances. *See Permian Basin Area Rate Cases, supra,* 390 U.S. at 767, 88 S.Ct. 1344; *F. P. C. v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944).

▮ Under such standard of review, the conditions under attack must be upheld. The Commission's curtailment policies, upheld by this Court, hold boiler use to be of low priority. *See Louisiana v. F. P. C.,* 503 F.2d 844, 858–860 (5th Cir. 1974). Having found that it is against the public interest for natural gas to be used for boiler fuel during times of shortage when higher priority needs cannot be filled, it is not unreasonable or arbitrary to attach conditions on a transportation certificate to prohibit boiler use of Federal Domain offshore gas.

Amoco offered no evidence to show why the Commission's policy of assigning a low priority to the use of gas for boiler fuel should not apply to this proceeding. In *F. P. C. v. Transcontinental Pipe Line Corp.,* 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961), characterizing the issue as "whether Congress intended to preclude the Commission from denying certification on the basis of the policy considerations advanced by its staff," *id.* at 6, 81 S.Ct. at 438, the Court observed:

> No one disputes that natural gas is a wasting resource and that the necessity for conserving it is paramount. As we see it, the question in this case is whether the Commission, through its certification power, may prevent the waste of gas committed to its jurisdiction. One apparent method of preventing waste of gas is

to limit the uses to which it may be put, uses for which another, more abundant fuel may serve equally well. Thus the Commission in this case, as it often has in the past, has declared that the use of gas under industrial boilers is an "inferior" use, the assumption being that other fuels, particularly coal, are an adequate substitute . . . .

*Id.* at 8, 81 S.Ct. at 439 (footnotes omitted). The Supreme Court therefore approved the controlling weight given by the Commission to its boiler fuel policy. And so we must here.

■ FP&L contends that the Commission's orders discriminate unfairly against it and favor FGT's customers who use gas as boiler fuel. Although FP&L's standing might be questioned, since there is no evidence in this record that its contract needs will not be fulfilled, we nevertheless decide contrary to the argument made. Most of FGT's customers are residential and small commercial gas users. The Commission observed that of the near 2% of its annual volume which is sold to industrial customers, most of that gas did not go to boiler fuel users, because most of FGT's industrial customers are not boiler fuel users. In any event FGT has been ordered to file a curtailment plan which assigns boiler fuel a low priority. *Lehigh Portland Cement Co. v. Florida Gas Transmission Co.*, Docket No. RP75–79 (June 24, 1977). *See also Sebring Utilities Commission v. F. E. R. C.*, 591 F.2d 1003, 1007–1008 (5th Cir. 1979). Although of no particular significance to the decision of this point, we do note that all parties were given an opportunity to be heard at the proceedings held before the Commission. FP&L chose not to participate in the evidentiary hearings.

Having dealt with the arguments according to the law as we understand it, the orders of the Commission here under review must be affirmed.

AFFIRMED.